## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MEREDITH CORPORATION** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 1:08-cv-00257** |
| | ) | |
| **HOME INTERIORS & GIFTS, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## HOME INTERIORS & GIFTS, INC.'S RESPONSE IN OPPOSITION TO MEREDITH CORPORATION'S MOTION FOR PRELIMINARY INJUNCTION

Scott M. DeWolf
Kathleen M. Patrick
Rochelle Hutcheson & McCullough LLP
Bank of America Tower Plano
101 E. Park Blvd., Suite 951
Plano, Texas 75074
Telephone: (972) 735-9143
Fax: (972) 735-9780
Email: sdewolf@rhmlawyers.com
Email: kpatrick@rhmlawyers.com

-And

Martin Lobel
D.C. Bar No. 18960
Lee Ellen Helfrich
D.C. Bar No. 334557
Lobel Novins & Lamont, LLP
888 17th Street, N.W., Suite 810
Washington, D.C. 20006
Telephone: (202) 371-6626
Facsimile: (202) 371-6643
Email: lobel@lnllaw.com

# TABLE OF CONTENTS

SUMMARY OF RESPONSE.............................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 2

A.   THE MEREDITH-HIG RELATIONSHIP. .............................................................. 2

B.   THE MEREDITH-HIG DISPUTE. ........................................................................ 4

C.   THE AGREEMENT'S TERMS REGARDING TERMINATION. ....................... 5

D.   MEREDITH'S FAILURE TO TERMINATE. ....................................................... 6

E.   MEREDITH'S AFFIRMATIVE CONDUCT PROVES IT HAS NOT
TERMINATED THE AGREEMENT AND HIG REMAINS AUTHORIZED TO USE
THE BRANDING ELEMENTS.................................................................................... 8

   1.   MEREDITH IS REPRESENTING TO THE PUBLIC THAT HIG IS AN
   AUTHORIZED "BRAND LICENSING PARTNER."............................................. 8

   2.   MEREDITH'S POST-LITIGATION CONDUCT UNDER RELATED
   CONTRACTS WITH HIG AND UNDER THE AGREEMENT. ............................ 9

LEGAL ARGUMENT....................................................................................................... 10

A.   HIG HAS A VALID LICENSE TO USE THE BRANDING ELEMENTS
BECAUSE MEREDITH HAS NOT TERMINATED THE LICENSE
AGREEMENT............................................................................................................... 10

B.   MEREDITH CANNOT ESTABLISH THE ELEMENTS NECESSARY TO
OBTAIN INJUNCTIVE RELIEF................................................................................. 14

   1.   MEREDITH HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS
   ON THE MERITS. ................................................................................................ 17

      (a)   MEREDITH CANNOT DEMONSTRATE THAT HIG'S USE OF THE
      BRANDING ELEMENTS IS "UNAUTHORIZED."......................................... 17

      (b)   MEREDITH CANNOT DEMONSTRATE LIKELIHOOD OF
      CONFUSION BECAUSE HIG'S USE IS AUTHORIZED................................. 20

   2.   MEREDITH HAS NOT SHOWN IT WILL SUFFER IRREPARABLE
   HARM..................................................................................................................... 21

   3.   AN INJUNCTION WILL SUBSTANTIALLY HARM HIG. ......................... 25

4.    AN INJUNCTION WILL NOT SERVE THE PUBLIC INTEREST. ............. 27

CONCLUSION .............................................................................................................. 27

# TABLE OF AUTHORITIES

*Cases*

*All Care Nursing Services, Inc. v. Bethesda Memorial Hospital, Inc.,*
    887 F.2d 1535 (11th Cir. 1989) ..................................................... 16

*Arthur Guinness & Sons, PLC v. Sterling Publishing Co.,*
    732 F.2d 1095 (2d Cir. 1984)............................................... 11, 23

*Burger King Corp. v. Lee,* 766 F. Supp. 1149 (S.D. Fla. 1991) ....................... 13

*Burger King Corp. v. Mason,* 710 F.2d 1480 (11th Cir. 1983) ....................... 13

*Computer Currents Publishing Corp. v. Computer Currents Licensing Corp.,*
    968 F. Supp. 684 (N.D. Ga. 1997) .............................................. 19

*Donoghue v. IBC/USA (Publications), Inc.,*
    886 F. Supp. 947 (D. Mass), aff'd, 70 F.3d 206 (1st Cir. 1995)............ 13, 19

*EBay Inc. v. Mercexchange, L.L.C.,* 547 U.S. 388, 126 S. Ct. 1837 (2006)................. 15

*Feltner v. Columbia Pictures Television, Inc.,*
    523 U.S. 340, 118 S. Ct. 1279 (1998)........................................ 26

*Franchised Stores of N.Y., Inc. v. Winter,* 394 F.2d 664 (2d Cir. 1968).......... 13

*GTE Corp. v. Williams,* 731 F.2d 676 (10th Cir. 1984)................................. 16

*Harris Research, Inc. v. Lydon,* 505 F. Supp. 2d 1161(D. Utah 2007) ..................... 15, 16

*Iberia Foods Corp. v. Romeo,* 150 F.3d 298 (3d Cir. 1998).......................25-26

*Jet Blast, Inc. v. Hershey's Mill Indus. Servs., Inc.,*
    32 U.S.P.Q.2d 1173 (E.D. Pa. 1994) .......................................... 18

*Luxoticca Group, S.P.A. v. Bausch & Lomb, Inc.,*
    160 F. Supp. 2d 545 (S.D.N.Y. 2001)................................... 12, 25

*McDonald's Corp. v. Robertson,* 147 F.3d 1301 (11th Cir. 1998)................... 17

*MyGym, LLC v. Engle,* 2006 U.S. Dist. LEXIS 88375 (D. Utah December 6, 2006)...... 15

*National League of Junior Cotillions, Inc. v. Porter,*
    2007 U.S. Dist. LEXIS 58117 (W.D.N.C. August 9, 2007).......................... 15

*New York Times Co. v. Tasini,* 533 U.S. 483, 121 S. Ct. 2381 (2001) .............. 15

*O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft,*
    389 F.3d 973 (10th Cir. 2004) ...................................................................... 17

*Oleg Cassini, Inc. v. Couture Coordinates, Inc.,*
    297 F. Supp. 821 (S.D.N.Y. 1969) ............................................................... 12

*Papa John's International, Inc. v. Dynamic Pizza, Inc.,*
    317 F. Supp. 2d 740 (W.D. Ky. 2004) ..................................................... 12, 18

*Rogers v. HSN Direct Joint Venture,* 1999 U.S. Dist. LEXIS 14392, at *7-8 (S.D.N.Y.
    September 19, 1999) ...................................................................................... 26

*S&R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371 (3d Cir. 1992) ............................... 13, 19

*Schrier v. University of Colo.,* 427 F.3d 1253 (10th Cir. 2005) ................................. 17, 22

*Segal v. Geisha LLC,* 517 F.3d 501 (7th Cir. 2008) ............................................. 17, 20, 21

*Spectrum Creations, L.P. v. Carolyn Kinder Int'l, LLC,*
    2008 U.S. Dist LEXIS 10603 (W.D. Tex. February 13, 2008) ..................... 12

*Sterling v. Constantin,* 287 U.S. 378, 53 S. Ct. 190 (1932)............................................. 24

*Tull v. United States* 481 U.S. 412, 107 S. Ct. 1831 (1987)............................................. 26

*Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n,*
    259 F.2d 921 (D.C. Cir. 1958)................................................................. 14, 22

**Statutes**

15 U.S.C. 1116(a) ............................................................................................................ 15

**Treatises**

POMEROY: EQUITY JURISPRUDENCE, Vol. 4, 5th Ed., 934-35 ..................................... 27, 29

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MEREDITH CORPORATION** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| **HOME INTERIORS & GIFTS, INC.** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

**CASE NO. 1:08-cv-00257**

## HOME INTERIORS & GIFTS, INC.'S RESPONSE IN OPPOSITION TO MEREDITH CORPORATION'S MOTION FOR PRELIMINARY INJUNCTION

**NOW COMES,** Defendant Home Interiors & Gifts, Inc. ("HIG"), through its counsel, and for its Response to Meredith Corporation's Motion for Preliminary Injunction (the "Response") would show the Court as follows:

### SUMMARY OF RESPONSE

Meredith Corporation ("Meredith") asks this Court to enter a preliminary injunction enjoining HIG's use of its Better Homes & Gardens trademarks. Meredith seeks this extraordinary relief despite the fact that HIG has a license to use the Better Homes & Gardens trademarks — a license that is still valid and has not been terminated. The parties' licensing agreement expressly provides that HIG's license to use Meredith's marks *only* terminates upon the end of the term or express termination. Neither has occurred.

Meredith's only argument to support an injunction is HIG's alleged failure to make a single royalty payment. But the agreement contains no provision suspending or

terminating the license upon non-payment of royalties or for any other material breach. Unless and until one of the parties affirmatively terminates the agreement, the license remains valid and HIG's use of Meredith's marks remain authorized.

Not only does HIG still have a valid license, but Meredith continues to represent to the world that HIG is a "brand licensing partner" on the Better Homes & Gardens website, www.bhg.com. Meredith also does not have a single complaint about the quality or genuineness of any product it now purports to enjoin HIG from distributing. Indeed, Meredith could not have any complaint because it pre-authorized each of the products for distribution when it approved and actually printed hundreds of thousands of catalogs for HIG to use in its sales efforts after this dispute arose. Meredith's conduct is completely inconsistent with its request for preliminary injunctive relief.

In such circumstances, no licensor is entitled to injunctive relief enjoining the use of its marks. Only where "unauthorized use" of a trademark is occurring can a trademark holder begin to meet the rigorous requirements of preliminary injunctive relief. Here, Meredith does not come close to meeting its burden and the request for injunctive relief must be denied.

## FACTUAL BACKGROUND

### A.    THE MEREDITH-HIG RELATIONSHIP.

HIG is the largest direct seller of home accessories in North America. *See* Declaration of Shari Gustafson, Exhibit A ("Gustafson Dec.") (at ¶ 4). In 2003, Meredith and HIG entered into a certain agreement entitled "Meredith Corporation-Home Interiors & Gifts, Inc. Strategic Alliance" (the "Agreement"). *See id.* at ¶ 21. The Agreement provides, among other things, HIG a license to use Meredith's Better Home & Gardens

trademarks (the "Branding Elements"). *See id.* at ¶ 22; *see also* Agreement Licensing Summary, Exhibit 4 to Motion (defining "Branding Elements"). The Agreement is for a thirteen-year term. *See* Second Amendment Agreement at 3 (extending term of original agreement) at Exhibit 4.

The Agreement provides HIG a license to use the Branding Elements "in connection with the manufacture and promotion of the products specified in the License Summary." *See* Agreement at 1.1.1. The Agreement provides a license to use the Branding Elements on a large variety of home interior and decorative products. *See* Gustafson Dec. at ¶ 23. Indeed, HIG has the right to use the Branding Elements with over 900 such products. *See id.* at ¶ 24. The Agreement, however, does contain restrictions on the use of the Branding Elements. For example, the Agreement provides that HIG cannot use the Branding Elements in connection with HIG's "business sign, stationary, or forms" or "as the name of [HIG's] business." *See* Agreement at 1.5.2. Further, the Agreement contains certain quality control requirements related to the type of products upon which HIG may use the Branding Elements. *See* Agreement at 1.5.3 (restricting the use to products that may "tarnish, or bring disrepute upon, the reputation of or goodwill associated with the Branding Elements"); *see also* Agreement at 2.8.[1]

The Agreement also provides certain rights of exclusivity in the use of the Branding Elements to HIG. *See* Agreement License Summary at J. The exclusivity granted to HIG is a material term of the Agreement as it provides HIG protection from the Branding Elements being used by competitors of HIG. Absent an exclusivity

---

[1]    It is significant that Meredith has not alleged a violation of any of these provisions. Meredith is not complaining about how the Branding Elements are being used, only that HIG is using the marks without paying last quarter's royalty fee. Non-payment of fees does not render the use of the marks unauthorized, however.

**DEFENDANT HOME INTERIOR'S RESPONSE**
**TO MOTION FOR PRELIMINARY INJUNCTION – PAGE 3**

provision, HIG would not be able to realize the value of the Agreement and its entire purpose for entering the Agreement would be frustrated. *See* Gustafson Dec. at ¶ 27. HIG believes Meredith has violated the exclusivity provision of the Agreement by entering into a contract with Wal-Mart. *See id.* at ¶ 25.

### B.    THE MEREDITH-HIG DISPUTE.

After the announcement of a new agreement authorizing the use of the Branding Elements to Wal-Mart, HIG did not make a royalty payment due under the Agreement.[2] HIG believes Meredith is in material breach of the Agreement. Despite numerous requests, Meredith refuses to allow HIG to review the Wal-Mart contract. *See id.* at ¶ 26.

On February 8, 2008, Meredith sent a demand letter to HIG demanding payment of the $1,000,000.00 royalty fee and a quarterly report due under the Agreement. *See* February 8, 2008 Letter from John S. Zieser to Richard Heath, Exhibit B. In response, on February 13, 2008, HIG advised Meredith it was in material breach due to the Wal-Mart contract and Meredith's failure to provide a link on the bhg.com website. *See* February 13, 2008 Letter to Jack Griffin from HIG, Exhibit C.

Two days later and in response to HIG's letter, Meredith filed this lawsuit asserting HIG is liable for breach of contract and trademark infringement. *See* February 15, 2008 Letter from John S. Zieser to Brian Hermes, Exhibit D. At no time, including as of the filing of its Motion for Preliminary Injunction, has Meredith terminated the Agreement. *See e.g.*, February 8, 2008 Letter from John Zieser, Exhibit B.

---

[2]    Meredith also claims HIG failed to supply a certain report due under the Agreement. This similarly does not support the entry of a preliminary injunction, but the issue is now moot because HIG has provided Meredith with the report in question.

DEFENDANT HOME INTERIOR'S RESPONSE
TO MOTION FOR PRELIMINARY INJUNCTION – PAGE 4

## C.    THE AGREEMENT'S TERMS REGARDING TERMINATION.

The Agreement expressly grants HIG the right to use the Branding Elements. *See* Agreement at 1.1.1 (providing that "subject to the terms and conditions of this Agreement, Meredith grants Licensee the right, during the Term, to reproduce and use the Branding Elements . . ."). The Agreement is clear that the license granted to HIG for the use of the Branding Elements "will commence on the date of the later signature on the License Summary **and, unless otherwise terminated, will continue until the expiration of the last Contract Year** . . .".    Agreement at 5.1 (emphasis added); *see also* Agreement at 5.4.1 ("**Upon the expiration or termination of this Agreement**, all rights granted to Licensee under this Agreement revert to Meredith . . .") (emphasis added).    At the risk of stating the obvious, Meredith could have drafted the Agreement to provide that the rights to use the Branding Elements revert to Meredith upon expiration, termination *or in the event of uncured material breach by HIG.* Meredith, however, did not do so.

It is undisputed that the contract term has not expired. As such, unless there has been a "termination," HIG's license to use the Branding Elements is still valid, and any use of the Branding Elements is not a violation of the Lanham Act or any common law unfair competition doctrine. The Agreement specifically addresses who, when, and how a party may terminate the Agreement, as well as the rights and remedies of the parties in the event of a termination. *See* Agreement at Section 5. Meredith asserts HIG's failure to pay an amount due under the Agreement effects a termination of the Agreement and/or HIG's right to use the Branding Elements. *See* Memorandum in Support of Preliminary Injunction at 1 ("Memorandum"). This is incorrect under the plain, unambiguous terms of the Agreement.

The Agreement addresses the rights and remedies of the parties in the event of a material breach. Specifically, the Agreement provides:

> **Meredith may terminate** this Agreement upon written notice in the event that any material breach of this Agreement by Licensee (and/or authorized Manufacturer) that is not cured within forty-five (45) days of Licensee's receipt of written notice thereof.

Agreement at 5.2.1 (emphasis added). The Agreement unambiguously provides Meredith the right to terminate in the event of an uncured material breach. The language, however, makes it clear that termination is not automatic.

Further, the Agreement addresses Meredith's rights in the event of HIG's "failure to pay any material sum due Meredith under this Agreement." *See* Agreement at 5.4. Specifically, if HIG fails to pay any material sum due, Meredith may only terminate the Agreement through written notice (the "Termination Notice"). *See id.* If Meredith provides a Termination Notice, Meredith must also state whether the Agreement is being immediately terminated, including the immediate revocation of HIG's right to use the Branding Elements. *See id.* Without this specific notice, Meredith and HIG enter into a two-year "sell off period" in which HIG would continue to have the "limited right to sell off and deliver" any licensed products. *See id.* at 5.4.2.

### D.    MEREDITH'S FAILURE TO TERMINATE.

Meredith also shares this construction of the Agreement. On February 8, 2008, John Zieser, Chief Development Officer, General Counsel and Secretary of Meredith, sent a demand letter to HIG demanding payment of the $1,000,000.00 payment and certain required reports. *See* February 8, 2008 Letter from John Zieser, Exhibit B. In his letter, Mr. Zieser makes plain that the Agreement is not yet terminated and implies that HIG may continue to use the Branding Elements. As Mr. Zieser stated:

> **Take note as well that HIG's breach of the Agreement provides Meredith with grounds to terminate the Agreement at its option, and Meredith reserves its rights to do so and to seek damages for breach of the Agreement**. In addition, pursuant to Sections 5.2.1, 5.4.1 and 5.4.2 of the Agreement, **in the event that Meredith terminates the Agreement for HIG's failure to pay the sums owed, all rights of HIG to continue to use the Meredith Branding Elements in its promotion and sale of Licensed Products shall immediately terminate**. Lastly, under Section 11 of the parties' Agreement, Meredith reserves the right to restrain any such breach of the Agreement by equitable relief.

February 8, 2008 Letter from John S. Zieser, Exhibit B (emphasis added).[3]

Mr. Zieser's letter makes it clear Meredith had the right to terminate the Agreement, but was not exercising that right. Indeed, Mr. Zieser specifically "reserved" that right. Until Meredith formally terminates the Agreement, HIG has the right to use the Branding Elements. *See id.* ("*In the event that Meredith terminates* ... all rights of HIG .. [in the Branding Elements] ...shall immediately terminate.") (emphasis added).

Meredith has not provided any notice of termination, much less written notice. Instead, it has simply demanded payment, filed this action, and now seeks an injunction. Meredith cannot have it both ways—either it needs to terminate the Agreement, provide a Termination Notice for HIG to immediately cease using the Branding Elements, or notify HIG that the Agreement is terminated and HIG has the right to sell-off the remaining products. *See* Agreement at 5.2.1, 5.4.1, and 5.4.2.

---

[3]   It should be noted that Mr. Zieser's assertion that upon termination the right to use the Branding Elements immediately terminates is not completely accurate. If Meredith provides a Termination Notice it can either demand that HIG immediately cease using the Branding Elements or allow for HIG to sell the existing inventory with the Branding Elements during a "Sell-Off Period." *See* Agreement at 5.4.2.

DEFENDANT HOME INTERIOR'S RESPONSE
TO MOTION FOR PRELIMINARY INJUNCTION – PAGE 7

**E.    MEREDITH'S AFFIRMATIVE CONDUCT PROVES IT HAS NOT TERMINATED THE AGREEMENT AND HIG REMAINS AUTHORIZED TO USE THE BRANDING ELEMENTS.**

**1.    MEREDITH IS REPRESENTING TO THE PUBLIC THAT HIG IS AN AUTHORIZED "BRAND LICENSING PARTNER."**

Meredith's own conduct establishes they have not affirmatively terminated the Agreement. As of the date of this filing, Meredith has added a link to the Better Homes & Gardens website, www.bhg.com, listing "Home Interiors" as one of its "Brand Licensing Partners." *See* www.bhg.com, Exhibit E. If one clicks on the link to "Home Interiors," the user is taken directly to products with the Branding Elements that can be purchased from HIG. Unlike any case Meredith relies on, the purported owner of the mark is actually directing, indeed promoting, the licensee's use of the mark as authorized.

In support of its Motion, Meredith attaches the Declaration of David J. Johnson (the "Johnson Dec."). Mr. Johnson advises the Court that Meredith now provides a "link to HIG" and HIG "is the first [company] listed after 'Brand Licensing Partners' at the bottom of the first page [of the Better Homes & Garden's website]." *See* Johnson Dec. at ¶ 26. That is still correct as of the time of this filing. *See* Exhibit E. These sworn statements, however, directly contradict the relief Meredith is now requesting. Remarkably, Meredith is asking this Court to enjoin, for alleged trademark infringement, an entity the trademark holder is currently promoting on its website as a "Brand Licensing Partner." Meredith's actions are curious to say the least, and certainly devastating to any trademark holder's claim that a third-party is making unauthorized use of their trademarks.

HIG's use of the Branding Elements is directly in accordance with the Agreement. Meredith is simply attempting to use the trademark laws—and this Motion—as a negotiation tactic to force HIG to pay royalties sooner rather than later. *See, e.g.,* Meredith's Original Complaint (only requesting injunction until payments are made current). But the Agreement is clear that the rights to use the Branding Elements do not revert to Meredith until (a) expiration of the agreement or (b) termination. *See* Agreement at 5.4.1 ("Upon the expiration or termination of this Agreement, all rights granted to Licensee … revert to Meredith.").

### 2. MEREDITH'S POST-LITIGATION CONDUCT UNDER RELATED CONTRACTS WITH HIG AND UNDER THE AGREEMENT.

Meredith and HIG are parties to other contracts besides the Agreement at issue here. One of the more significant, and directly relevant, related contracts is a printing contract between Meredith and HIG. *See* Gustafson Dec. at ¶ 49. Succinctly, Meredith provides printing services for catalogs that HIG produces to sell its products. *See id.* HIG's largest catalog is printed on a quarterly basis. *See id.* at ¶¶ 8-9. The most recent catalog was due to be printed after this dispute arose and Meredith filed this lawsuit. *See id.* at ¶ 52.

For the first time during the parties' relationship, Meredith required HIG pay in full and in advance under the parties printing contract. *See id.* at ¶¶ 52-53. Meredith was well aware when it was demanding payment for printing costs that it would be printing catalogs containing products bearing Meredith's marks. *See id.* at ¶¶ 37-41. If Meredith truly believed HIG's use of the Branding Elements was unauthorized, it certainly should

not have acquiesced in the publishing of a voluminous catalog with a circulation of approximately one million. *See id.* at ¶ 10.

In addition to demanding payment for the printing of the Summer Quarterly, containing products with the Branding Elements, after filing this lawsuit, Meredith has continued to review and approve HIG's use of the Branding Elements. *See id.* at ¶¶ 37-47. In fact, as recently as three-weeks ago, Meredith approved HIG's publication of the May Monthly, a monthly catalog published and circulated by HIG to its consultants and customers containing all of HIG's products, including those with Branding Elements. *See id.* ¶¶ 42-47. HIG's monthly catalog has a circulation of over 1.2 million per month. *See id.* at ¶ 20. Further, Meredith approved the May Monthly and it contains on the *cover* a product containing the Branding Elements. *See id.* at ¶ 46.

The injunction Meredith seeks would require HIG to obtain all of the catalogs in current circulation at tremendous expense to HIG. *See id.* at ¶¶ 64-65. Given Meredith's failure to terminate, and demand for payment to print the catalog containing products with the Branding Elements, it is completely inequitable to allow Meredith to now seek the destruction of these catalogs—especially where it has not terminated the Agreement.

### LEGAL ARGUMENT

### A.  HIG HAS A VALID LICENSE TO USE THE BRANDING ELEMENTS BECAUSE MEREDITH HAS NOT TERMINATED THE LICENSE AGREEMENT.

As a threshold matter, the Court must determine whether the Agreement has been terminated. Meredith does not plead in either its Original Complaint or in its Motion for Preliminary Injunction that the Agreement has been terminated. Rather, Meredith skirts this critical issue by arguing that failure to make a royalty payment is a material breach

justifying the imposition of injunctive relief. Neither the Agreement nor the law provides Meredith such an extraordinary remedy.

Licensors, like Meredith, seeking injunctive relief from a licensee, like HIG, have consistently been rebuffed when the licensor does not establish the license agreement has been validly terminated. For example, the Second Circuit in *Arthur Guinness & Sons, PLC v. Sterling Publishing Co.*, 732 F.2d 1095 (2d Cir. 1984), was presented with a similar issue. In *Guinness*, Arthur Guinness & Sons, the licensor of the "Guinness Book of World Records" sought to enjoin one of its licensees, Sterling Publishing Company, from publishing the 1984 version of the American Guinness Book of World Records. *See id.*

There, the licensor and licensee were in a fee dispute under the license agreement. Arthur Guinness & Sons ("Guinness"), the licensor, asserted it had terminated the license agreement and sought an injunction against the licensee. The district court denied the licensor's request for a preliminary injunction and the Second Circuit affirmed. In doing so, the Second Circuit noted that because Sterling was licensed to use Guinness's marks the licensor "would have to show" the agreement "was no longer in force to obtain an injunction." *See id.* at 1100. The Second Circuit noted that a failure to make royalty payments "does not, as a matter of law, establish a material breach justifying rescission of the contract **absent an express provision in the agreement**." *See id.* at 1101 (emphasis added).[4] As a result, the Second Circuit found that Guinness could not meet the "likelihood of success" requirement to obtain injunctive relief because it was doubtful the

---

[4] HIG is well aware that the Agreement at issue specifically defines a non-payment of royalties as a "material breach." But nothing in the Agreement provides that a material breach automatically terminates the contract. Thus, Meredith may be entitled to terminate because of HIG's non-payment, but the question here is not whether the termination was valid or justified. Here, the Court must determine if there has simply been a termination at all. There has not been.

DEFENDANT HOME INTERIOR'S RESPONSE
TO MOTION FOR PRELIMINARY INJUNCTION – PAGE 11

asserted termination was either justified or valid. Without showing the license agreement

was terminated, Guinness could not prevail at the preliminary injunction stage.

Other courts have reached the same conclusion. *See Luxoticca Group, S.P.A. v.*

*Bausch & Lomb, Inc.*, 160 F. Supp. 2d 545, 551 (S.D.N.Y. 2001) (denying preliminary

injunction where trademark holder could not demonstrate it validly terminated the license

agreement); *Oleg Cassini, Inc. v. Couture Coordinates, Inc.*, 297 F. Supp. 821, 827-28

(S.D.N.Y. 1969) (refusing to enter preliminary injunction where licensor did not

demonstrate that the license agreement had been effectively terminated); *Papa John's*

*International, Inc. v. Dynamic Pizza, Inc.*, 317 F. Supp. 2d 740, 743-44 (W.D. Ky. 2004)

(denying summary judgment on Lanham Act claims by mark holder where it could not

provide proof that it validly terminated license). Moreover, in one recent case in a

similar context, a court rejected the precise theory espoused by Meredith—that the failure

to pay royalties results automatically in a revocation of the license. As the court stated:

> The Court rejects CKI's argument that the payment of royalties was a
> condition precedent to Spectrum's use of Design licenses. According to
> Nimmer, **'[i]n most cases, payment of royalty obligations is not a
> precondition to the right to exercise the rights granted under the
> license' and, absent contractual language to the contrary, 'the
> presumption will typically not be that non-payment of royalties
> automatically terminates the right to use the licensed subject matter.'**
> *See* NIMMER, MODERN LICENSING LAW § 7:24. **'To transform royalty
> payment into a condition, the contractual language would have to be
> very explicit and the parties' performance must have been consistent
> with enforcing that provision.'** *Id.* Nowhere does the [agreement]
> condition the transfer of the license or its use on payment of royalties.
> Rather, it provides that, should Spectrum fail to pay royalties, CKI could
> terminate the contract upon notice and opportunity to cure. This provision
> is not consistent with finding that payment of royalties is a condition to
> use of the license.

*Spectrum Creations, L.P. v. Carolyn Kinder Int'l, LLC*, 2008 U.S. Dist LEXIS 10603, at

\*240-41 (W.D. Tex. February 13, 2008) (emphasis added).

The cases Meredith cites do not dispute that proper termination of a valid license agreement is required before a finding of infringement. The reason is simple: in all such cases the licensor validly terminated the license, the license expressly terminated on failure to pay royalties, there was no dispute the license agreement was terminated, or the use sought to be enjoined was otherwise unauthorized. *See e.g. S.R. Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 374 (3d Cir. 1992) (license holder terminated the underlying agreement and injunction sought related to post-termination use of the marks); *Burger King Corp. v. Lee,* 766 F. Supp. 1149, 1151 (S.D. Fla. 1991) (failure to pay royalties resulted in actual termination and post-termination use was enjoined); *Franchised Stores of N.Y., Inc. v. Winter,* 394 F.2d 664, 668 (2d Cir. 1968) (enjoining unauthorized use of marks); *Baskin-Robbins Ice Cream Co. v. D&L Ice Cream Co., Inc.,* 576 F. Supp. 1055, 1059-60 (E.D.N.Y. 1983) (further use of mark after termination of license agreement was trademark infringement); *Burger King Corp. v. Mason,* 710 F.2d 1480, 1492-93 (11th Cir. 1983) (use of mark after termination was trademark infringement); *Donoghue v. IBC/USA Publications, Inc.,* 886 F. Supp. 947, 953 (D. Mass), *aff'd,* 70 F.3d 206 (1st Cir. 1995) (enjoining unauthorized use of marks).

Here, however, the Agreement does not provide for automatic termination in the event of a material breach or the failure to make royalty payments. Rather, the Agreement must be affirmatively terminated by Meredith to revoke the license. *See* Agreement at 5.2.1. Moreover, even if that is done, HIG still has the right to sell its existing inventory and use the Branding Elements, unless Meredith specifically demands that HIG immediately cease selling and destroy the goods. *See* Agreement at 5.4.2.

Meredith has not done any of these things.  Consequently, Meredith is not entitled to injunctive relief.

By Meredith's own admission, it understands, absent termination of the Agreement, HIG remains authorized to use the Branding Elements under the Agreement. In its February 8, 2008 letter, Meredith stated the Agreement was not yet terminated, that Meredith "reserved its rights" to terminate, and "in the event that Meredith terminates" HIG would no longer be authorized to use the Branding Elements. *See* February 8, 2008 Letter from John S. Zieser, Exhibit B.

Based on Meredith's General Counsel's statements, HIG retains the right to use the Branding Elements until Meredith properly terminates the Agreement.  And, of course, Meredith's conduct vis-à-vis the general public certainly supports a finding of non-termination and authorized use.  *See* Dec. of Johnson at ¶ 26 (describing link on Better Homes & Gardens website holding HIG out to public at large as "Brand License Partner").

### B.    MEREDITH   CANNOT   ESTABLISH   THE   ELEMENTS NECESSARY TO OBTAIN INJUNCTIVE RELIEF.

To obtain the injunctive relief it seeks, Meredith must establish the following traditional and well-established grounds for equitable relief:  (a) a likelihood of success on the merits (b) an irreparable injury without the injunction; (c) the injunction would not substantially harm other parties; and (d) the public interest is served by the injunction. *See Virginia Petroleum Jobbers Assn. v. Fed. Power Comm'n,* 259 F.2d 921, 925 (D.C. Cir. 1958).  Meredith cannot meet this heavy burden.

Meredith asserts it is entitled to certain presumptions in seeking its preliminary injunction.  Meredith's arguments and authorities relied upon should be viewed by the

Court with a healthy degree of skepticism. While Meredith's cases have not been expressly reversed, such opinions are of questionable validity given the Supreme Court's recent decision in *EBay Inc. v. Mercexchange, L.L.C.*, 547 U.S. 388, 126 S. Ct. 1837 (2006).

In *EBay*, the Supreme Court examined the validity of a presumption often applied in patent cases. Traditionally, when a patent holder established a valid patent and infringement, courts would routinely find that injunctions should be denied only in "exceptional circumstances." The Supreme Court rejected this rule in *Ebay*, however, and held that "injunctive relief under the Patent Act, no less than in other cases governed by the standards of equity—a party seeking injunctive relief must establish the traditional elements of injunctive relief." *See EBay, Inc.*, 547 U.S. at 391.

The rejection of the "presumptive" right to injunctive relief or the presumptive establishment of certain required elements has also been applied by the Supreme Court in the copyright context. *See New York Times Co. v. Tasini*, 533 U.S. 483, 505, 121 S. Ct. 2381 (2001) (rejecting any presumptive rights to injunctive relief where copyright infringement established).

While the Supreme Court has not yet addressed the issue with respect to the Lanham Act, lower courts are already openly questioning the validity of the doctrine in the trademark sphere. *See e.g., National League of Junior Cotillions, Inc. v. Porter*, 2007 U.S. Dist. LEXIS 58117, at *18-20 (W.D.N.C. August 9, 2007). District Courts faced with the question in Lanham Act claims after *EBay* have rejected the presumption Meredith advocates. *See Harris Research, Inc. v. Lydon*, 505 F. Supp.2d 1161, 1168 (D. Utah 2007); *MyGym, LLC v. Engle*, 2006 U.S. Dist. LEXIS 88375, at *34 (D. Utah

December 6, 2006). The *EBay* holding should be applied here, as the right to injunctive relief under the Lanham Act, like the Patent Act, is "according to the principles of equity." *See* 15 U.S.C. 1116(a).

Resting on a presumption that is of questionable validity, Meredith largely ignores the traditional rigorous requirements to obtain injunctive relief in its Motion. The Court should not do so. The plain language of the Lanham Act requires it, and *Ebay* certainly reinforces the idea that there should be no exception or relaxation of traditional requirements to obtain injunctive relief. To do anything other than hold Meredith strictly to its rigorous burden would do violence to fundamental equitable principles.

"A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to the four requisites." *All Care Nursing Services, Inc. v. Bethesda Memorial Hospital, Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989); *see also Harris Research, Inc. v. Lydon*, 505 F. Supp. 2d 1161, 1164 (D. Utah 2007) ("[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal."). Further, Meredith's burden is "especially heavy" when the "relief sought would in effect grant plaintiff a substantial part of the relief it would obtain after a trial on the merits." *GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984). Moreover, because Meredith seeks a disfavored injunction, its motion "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *See Schrier v.*

*University of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). Meredith cannot meet this burden. Thus, injunctive relief is inappropriate and must be denied.[5]

## 1.    MEREDITH HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.

### (a)    MEREDITH CANNOT DEMONSTRATE THAT HIG'S USE OF THE BRANDING ELEMENTS IS "UNAUTHORIZED."

Meredith seeks a preliminary injunction based on its claims for trademark infringement. To prevail on a trademark infringement claim, a plaintiff must show that "its mark was used in commerce by the defendant without the registrant's consent and that the unauthorized use was likely to deceive, cause confusion, or result in mistake." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1307 (11th Cir. 1998). Meredith cannot make such a showing.

Notably absent from Meredith's pleadings, affidavits and brief is any allegation that Meredith has terminated HIG's license. This is not oversight or mistake. Meredith has not terminated HIG's license. As a result, Meredith simply cannot demonstrate a likelihood of success on the merits.

It is axiomatic that one cannot prove a violation of the Lanham Act where the use of the mark is authorized. *See Segal v. Geisha LLC,* 517 F.3d 501 (7th Cir. 2008) (dismissing Lanham act claims were mark holder authorized the use under Rule

---

[5]    Historically, there are three disfavored preliminary injunctions: (1) those that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that give the movant all the relief it could obtain after a trial on the merits. *See O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004). Meredith seeks a mandatory preliminary injunction, which is the type of injunction that "affirmatively require[s] the non-movant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the non-movant is abiding by the injunction." *See Schrier*, 427 F.3d at 1261.

12(b)(6)); [6] *Papa John's International, Inc. v. Dynamic Pizza, Inc.*, 317 F. Supp. 2d 740, 743-44 (W.D. Ky. 2004) (denying summary judgment on Lanham Act claims where trademark holder could not demonstrate that it terminated the license agreement). [7]

Here, the plain language of the Agreement provides that the license only terminates upon termination or expiration of the term of the agreement. *See* Agreement at 5.1, 5.2.1, and 5.4.1. Neither expiration nor termination has occurred. Instead, all that has occurred is a HIG's failure to make a royalty payment. The failure to make a required royalty payment does not terminate the license. *See* Agreement at 5.2. To the contrary, the Agreement specifically provides that even after termination there can be a "sell-off period" in which HIG has "a limited right to sell off and deliver such Licensed Products . . ." *See id.* If Meredith wanted the agreement to terminate automatically upon non-payment of royalties, or if Meredith wanted the license to suspend after non-payment of royalties, the Agreement could have been drafted with such provisions. But it is not for this Court to supply a missing term or otherwise alter the parties' Agreement with injunctive relief.

Meredith relies on *Jet Blast, Inc. v. Hershey's Mill Indus. Servs., Inc.*, 32 U.S.P.Q.2d 1173 (E.D. Pa. 1994), to support its claim that the failure to make payments results in the forfeiture of the right to use a trademark. *See* Memorandum at 17. If one reads the case, however, it is clear the *Jet Blast* court's statements, so heavily relied upon by Meredith, are made in the context of an agreement expressly providing that a failure to

---

[6]    In dismissing the plaintiff's claims, the Seventh Circuit stated: "[W]here the trademark holder has authorized the use of its mark, there can be no likelihood of confusion and no violation of the Lanham Act, if the alleged infringer uses the mark as authorized." *Id.*

[7]    It should not be overlooked by the Court that after denying the trademark holder's motion for summary judgment on the grounds it could not prove it terminated the license, the court went on to state: "The Court would consider a motion prior to trial to dismiss these claims." *See id.* at 744.

make a payment required the licensee to "immediately forfeit its right to use, and [shall]

cease the use of" the licensor's mark. *See Jet Blast, Inc.*, 32 U.S.P.Q. 2d at \*8 (at Finding

of Fact 18). The Agreement here, however, has no similar provision.

Meredith also relies on *Donoghue v. IBC/USA (Publications), Inc.*, 886 F. Supp.

947 (D. Mass), *aff'd*, 70 F.3d 206 (1st Cir. 1995). Meredith claims that under *Donoghue*,

HIG's material breach "negates its rights to use the Meredith Marks." *See* Memorandum

at 16. Instead of directing the Court to the actual terms of the Agreement between the

parties on the relevant issue, Meredith attempts to support injunctive relief by simply

citing to *Donoghue*. *See id.* at 17. But *Donoghue* is hardly instructive. The *Donoghue*

court relied upon the Third Circuit's opinion in *S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968

F.2d 371, 376 (3d Cir. 1992), which dealt exclusively with a properly terminated

agreement. Because the contract in *Jiffy Lube* was terminated, any use of the holder's

marks was "unauthorized" and a finding of infringement was warranted. Those facts are

clearly distinguishable from the instant case.

One subsequent court was faced with the issue of whether *Jiffy Lube's* holding

stands for the proposition that a mark holder could obtain a preliminary injunction absent

a showing that it had terminated the agreement providing the license. *See Computer*

*Currents Publishing Corp. v. Computer Currents Licensing Corp.*, 968 F. Supp. 684, 688

(N.D. Ga. 1997). The court firmly rejected that proposition, the very proposition

Meredith asserts here:

> **Contrary to plaintiffs' assertion, however, *Jiffy Lube* does not stand**
> **for the proposition that a franchisor is entitled to a preliminary**
> **injunction enjoining a franchisee from using the franchisor's**
> **trademark absent a showing that the franchisor properly terminated**
> **the franchise agreement.** Therefore, in order to satisfy the first
> prerequisite for a preliminary injunction, plaintiffs must demonstrate that,

under the terms of the Agreement, they were entitled to terminate the Agreement immediately based on defendant's conduct.

*Id.* (Emphasis added).

Meredith has not terminated the Agreement. Until it does so, it simply is unable to obtain injunctive relief because HIG's use is authorized. On this record, Meredith has no chance of success on the merits of its infringement claims, much less a "likelihood of success."

**(b)  MEREDITH CANNOT DEMONSTRATE LIKELIHOOD OF CONFUSION BECAUSE HIG'S USE IS AUTHORIZED.**

Meredith claims there will be a "likelihood of confusion" because HIG is using the Branding Elements. All of the cases relied upon by Meredith are inapplicable because they deal with unauthorized use. Here, the Agreement expressly provides HIG the right to use the Branding Elements. There is no allegation that HIG's use of the Branding Elements in its products exceeds the authorized use. The only evidence before the Court that is directly relevant to the "confusion" analysis is Meredith's own conduct. By holding out HIG as a "Brand Licensing Partner" on the Better Homes & Gardens website, Meredith is affirmatively removing any "likelihood of confusion" from the market because it is telling the world that HIG is a licensing "partner."

When use of a trademark is authorized, courts have swiftly dismissed such Lanham Act claims. For example, in *Segal v. Geisha LLC*, 517 F.3d 501 (7th Cir. 2008), the Seventh Circuit recently dismissed a Lanham Act claim under Rule 12(b)(6) because the plaintiff could not demonstrate likelihood of confusion. As the Seventh Circuit held:

> In order to succeed on his Lanham Act claim, Segal must establish: (1) that Geisha Chicago owns a protectible trademark, and (2) that use of this mark by Japonais New York is likely to cause confusion among

consumers. **But where the trademark holder has authorized another to use its mark, there can be no likelihood of confusion and no violation of the Lanham Act if the alleged infringer uses the mark as authorized**.

*Segal*, 517 F.3d at 510-11 (citations omitted and emphasis added). Like the plaintiff in *Segal*, Meredith has authorized the use of the Branding Elements and therefore cannot demonstrate likelihood of confusion.

Meredith's support for its claim of a likelihood of confusion is non-existent. To support its claim, Meredith offers no evidence that consumers are actually confused or even could be confused. Meredith just cites cases involving the use of a mark by a party never authorized to use the license or where the licenses had been terminated. *See* Memorandum at 16-17. Meredith's verbiage, however, does not support a finding of likelihood of confusion. There simply cannot be a likelihood of confusion where the license has not been terminated and where the holder of the marks is promoting to the public that HIG is an authorized "Brand License Partner." *See* Johnson Dec. at ¶ 26.

## 2. MEREDITH HAS NOT SHOWN IT WILL SUFFER IRREPARABLE HARM.

Preliminary injunctive relief is extraordinary, drastic, and the exception rather than the rule. To obtain a preliminary injunction, Meredith must demonstrate "irreparable harm." As the D.C. Circuit explained in the Circuit's leading case on injunctive relief:

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958). To demonstrate "irreparable harm" the injury must be "certain, great, actual and not theoretical." *Schrier v. University of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005). Meredith has not demonstrated any such "irreparable harm" in its Motion. At best, Meredith has shown it has a claim for money damages.

Avoiding its evidentiary burden on the issue of "irreparable harm," Meredith simply relies on questionable authority to argue irreparable harm is presumed when a showing of "likelihood of success" is made. As demonstrated above, such a "presumption" is of questionable viability. *See supra* at 14-16. Further, Meredith's argument presupposes no valid license to use the Branding Elements exists. Because Meredith failed to terminate the agreement and HIG's use of the Branding Elements is authorized, there is no violation of the Lanham Act. Consequently, Meredith cannot establish a "likelihood of success" sufficient to garner a presumption of irreparable harm, even if one assumes such a presumption is applicable.

Meredith asserts that non-payment under the Agreement constitutes a basis to grant injunctive relief. But this simply is not the law. Non-payment may give rise to a claim for money damages, but it does not give rise to equitable relief. *See* POMEROY: EQUITY JURISPRUDENCE, Vol. 4, 5th Ed., 934-35. Notably, Meredith cites no case for the proposition that trademark infringement exists or injunctive relief is appropriate where an agreement requires termination to end the license and the agreement has not yet been terminated.

Unlike the cases Meredith cites, HIG is not an unauthorized user. As one court colorfully put it, "a pirate's use of another's trademark can, without more, establish so

substantial a likelihood of confusion among consumers to warrant a preliminary injunction." *Arthur Guinness & Sons, PLC*, 732 F.2d at 1099. Here, such a statement cannot be credibly made or supported. HIG is hardly a "pirate." This case involves a fee dispute between an authorized licensee and the licensor, which does not provide the basis for a finding of irreparable harm. As the Second Circuit stated in *Guinness*:

> But the instant case is not one where an unauthorized junior user appropriates a senior user's mark. Because Sterling is Guinness's licensee and the American edition of the Book of World Records has been produced by Sterling since 1961, we cannot perceive how Sterling's 1984 publication could irreparably have harmed its licensor unless the product was so inferior that it could severely injure Guinness's reputation in the United States.

*Id.*

HIG has been licensed to use the Branding Elements for over four years. Beyond the allegation that HIG has failed to make a royalty payment, Meredith does not allege HIG's products displaying the Branding Elements are in violation of the Agreement. In other words, Meredith is not complaining about its image being degraded or the Branding Elements losing value because of an inappropriate use. Meredith only complains about a single missed royalty payment, yet Meredith refuses to actually terminate the Agreement. In such circumstances, Meredith cannot establish irreparable harm and injunctive relief must be denied.

Distilled to its essence, Meredith's request for injunctive relief asks this Court to enjoin HIG's use of the Branding Elements because it is in material breach of the Agreement. Meredith knows that all it has is a breach of contract claim for damages, *i.e.* the $1,000,000.00 payment. That is insufficient to obtain an injunction.

Nearly a century ago, the Supreme Court appropriately stated: "Whether or not the injured party is entitled to an injunction will depend upon equitable principles; upon the nature of the right invaded and the adequacy of the remedy at law." *Sterling v. Constantin,* 287 U.S. 378, 403, 53 S. Ct. 190 (1932). Long-standing and fundamental principles of equity preclude the relief Meredith is seeking. At most, Meredith has a breach of contract claim for the non-payment of royalties, and as this Court knows, a legal action for breach of contract has a classic adequate remedy at law: money damages. As the leading treatise on equity states:

> **Equity will not interfere to restrain the breach of a contract**, the commission of a tort, or the violation of any right, **when the legal remedy of compensatory damages would be complete and adequate**.

POMEROY: EQUITY JURISPRUDENCE, Vol. 4, 5th Ed., 934-35 (emphasis added).

The Original Complaint reveals what Meredith is really after: they want to force the payment and delivery of the report before a determination on the merits of the case. *See* Meredith's Original Complaint, Exhibit F (at p. 11 "WHEREFORE, Meredith prays the Court enter an Order: (1) enjoining and restraining HIG, until it has made all payments required under the Agreement (including the Guaranteed Annual Minimum Royalty for 2007) and delivered in good faith to Meredith the written reports it is required to make pursuant to the Agreement, from its continuing breach of the parties' Agreement, including any further use of the [Branding Elements] . . ."). This is not a basis for injunctive relief. Meredith simply cannot and has not made a showing of irreparable harm to support this Court's invocation of its equity powers.

### 3.   AN INJUNCTION WILL SUBSTANTIALLY HARM HIG.

The injunctive relief Meredith seeks will substantially harm HIG.  By the terms of the proposed injunction HIG would be required to:

> Deliver up, at its expense, all home decorative products, catalogs, stationary, business forms, signs, advertisements, brochures, promotional materials, and other written materials which bear the infringing name or trademark BETTER HOMES AND GARDENS or the plaid checkerboard design or any name, mark, or design confusingly similar to Plaintiff's BETTER HOMES AND GARDENS mark or plaid checkerboard design mark, together with all plates, molds, matrices, and other means and materials for making or reproducing same.

*See* Proposed Injunction, attached to Meredith's Motion.

To comply with this provision, HIG would have to "deliver up" almost $3.2 million of goods bearing the Branding Elements. *See* Gustafson Dec. at ¶ 60.  All of these products have been previously approved by Meredith and purchased and paid for by HIG from independent manufacturers.  *See id.*  In addition, HIG recently paid Meredith for the printing and publication of its quarterly catalog with a circulation of approximately one million. *See id.* at ¶¶ 53-55.  Compliance with such a provision would be unduly burdensome and simply inequitable to HIG given that Meredith has not even terminated the Agreement. *See id.* at ¶¶ 37-47, 59-67.

In seeking this relief, Meredith also ignores the well-established doctrine known as the "exhaustion or first sale doctrine." *See e.g., Luxottica Group, S.p.A. v. Bausch & Lomb Inc.,* 160 F. Supp. 2d 545, 552 (S.D.N.Y. 2001) (discussing "exhaustion or first sale doctrine").   Here, Meredith authorized the manufacture of over $3.2 million of product bearing the Branding Elements. *See* Gustafson Dec. at ¶ 60.  There has been no allegation that the existing inventory HIG purchased from those manufacturers is anything other than "genuine" product.  When that is the case, the reseller is authorized to

sell the product and such sale is not trademark infringement. *See Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 306 (3d Cir. 1998) (reversing summary judgment on grounds that goods were 'genuine' and any sales did not constitute trademark infringement); *Rogers v. HSN Direct Joint Venture*, 1999 U.S. Dist. LEXIS 14392, at \*7-8 (S.D.N.Y. September 19, 1999) (denying preliminary injunction to the extent license holder had inventory of product bearing mark purchased from other manufacturer). The exhaustion doctrine weighs heavily against granting Meredith an injunction on the terms it seeks.

Further, the Declaration of Shari Gustafson, the Senior Vice President of Merchandising for HIG, establishes that the entry of Meredith's injunction would be financially devastating to HIG. *See id.* at ¶¶ 66, 73. Meredith seeks to require HIG, at its expense, to deliver up all the items with the Branding Elements, including products and publications. The cost of compliance, however, is far too burdensome. Indeed, the cost of *postage alone* to obtain the catalogs in circulation would exceed $2,500,000.00, *see id.* at ¶ 64, which is over twice the amount of damages Meredith seeks in its breach of contract claim. Equity does not countenance a remedy that would effectively punish a party for allegedly breaching a contract. *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 353, 118 S. Ct. 1279 (1998) (*quoting Tull v. United States* 481 U.S. 412, 422, 107 S. Ct. 1831 (1987) ("Remedies intended to punish culpable individuals ... were issued by courts of law, not courts of equity.")).

Furthermore, not only would the cost of compliance be exorbitant, but compliance would effectively eliminate HIG's ability to continue as a going concern. *See id.* at ¶ 73. Under these circumstances, Meredith simply cannot demonstrate the balance of harm supports the entry of an injunction. Indeed, courts are generally loathe to grant injunctive

relief that will put a company out of business — and the Court certainly should be here where Meredith has not shown any irreparable harm it would suffer in the absence of injunctive relief.

### 4.    AN INJUNCTION WILL NOT SERVE THE PUBLIC INTEREST.

Meredith claims the public interest supports the entry of an injunction because there will be "public confusion as to whether the products sold and marketed by Defendant HIG are, in fact, approved by, sponsored by, or affiliated with Plaintiff Meredith will remain unabated and, most likely, increase." Memorandum at 20. As demonstrated above, the products sold by HIG containing the Branding Elements are authorized under the Agreement by Meredith. Meredith currently is holding HIG out as an authorized "Brand License Partner." *See* Declaration of Johnson, at ¶ 26. There can be no public confusion where the use of the Branding Elements is authorized by Meredith. Absent termination, and evidence that HIG is not obeying the Termination Notice or otherwise not complying with the law, the public interest would not be served by the entry of a preliminary injunction.

### CONCLUSION

Meredith's request for a preliminary injunction must be denied. Meredith cannot demonstrate HIG's use of the Branding Elements is "unauthorized" because it has not terminated the Agreement authorizing their use. Meredith cannot even make out a prima facie claim under the Lanham Act, let alone demonstrate a likelihood of success on the merits. Moreover, Meredith is actually holding HIG out to the public as an authorized partner of Meredith. As such, there can be no demonstration of a likelihood of confusion — the *vel non* of a trademark infringement claim. Furthermore, the entry of a

DEFENDANT HOME INTERIOR'S RESPONSE
TO MOTION FOR PRELIMINARY INJUNCTION – PAGE 27

preliminary injunction with substantially harm HIG.  Where such harm is so one-sided, the entry of a preliminary injunction is simply inappropriate.    Accordingly, HIG respectfully requests that Meredith's request for a preliminary injunction be denied.  A proposed order denying the Motion is attached hereto as Exhibit G.

Respectfully submitted,


/s/ Scott M. DeWolf
Scott M. DeWolf
Kathleen M. Patrick
Rochelle Hutcheson & McCullough LLP
Bank of America Tower Plano
101 E. Park Blvd., Suite 951
Plano, Texas 75074
Telephone:  (972) 735-9143
Fax:  (972) 735-9780
Email:  sdewolf@rhmlawyers.com
Email:  kpatrick@rhmlawyers.com

-And

/s/ Martin Lobel
Martin Lobel
D.C. Bar No. 18960
Lee Ellen Helfrich
D.C. Bar No. 334557
Lobel Novins & LaMont, LLP
888 17th Street, N.W., Suite 810
Washington, D.C. 20006
Telephone:  (202) 371-6626
Facsimile:  (202) 371-6643
Email:  lobel@lnllaw.com

**Counsel for Defendant Home Interiors & Gifts, Inc.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing instrument was

served on the following counsel of record via the Court's ECF system, e-mail and/or U.S.

Mail on this 9th day of April, 2008:

Michael D. Hays
Mitchell H. Stabbe
DowLohnes PLLC
1200 New Hampshire Ave., N.W.
Suite 800
Washington, D.C. 20036-6802

James G. Sawtelle
Faegre & Benson, LLP
1900 Fifteenth Street
Boulder, CO 80302-5414

/s/ Scott M. DeWolf

Scott M. DeWolf

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MEREDITH CORPORATION** )<br>)<br>**Plaintiff,** )<br>)<br>**vs.** )<br>)<br>**HOME INTERIORS & GIFTS, INC.** )<br>)<br>**Defendant.** )<br>) | **CASE NO. 1:08-cv-00257** |

**DECLARATION OF SHARI GUSTAFSON IN SUPPORT OF DEFENDANT'S**
**RESPONSE TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Shari Gustafson, being duly sworn, declares and says:

1.      I am the Senior Vice President of Merchandising for Defendant Home Interiors & Gifts, Inc. ("HIG"). I am making this declaration in support of HIG's Response to Plaintiff Meredith Corporation's Motion for a Preliminary Injunction.

2.      I have been employed by HIG since March 2001.

3.      In my role as Senior Vice President of Merchandising for HIG, I oversee all merchandising and communication pieces related to HIG and the products it markets and sells.

**HOME INTERIORS:  A BRIEF OVERVIEW**

4.      HIG is the largest direct seller of home accessories in North America.

5.      To sell its products, HIG utilizes a network of over 60,000 independent consultants ("Consultants") who sell HIG's products to friends, family and other customers.

6.    HIG utilizes various print marketing tools to market its products through its Consultants.

7.    While not an exhaustive list, there are several routine print marketing materials published and circulated by HIG.

8.    First, on a quarterly basis HIG prepares, prints, and circulates what is commonly referred to as the "Quarterly Catalog" or the "Quarterly" (the "Quarterly").

9.    The Quarterly contains all the active, core products that HIG sells and is sent to Consultants and purchased by Consultants on a quarterly basis.

10.    On March 6, 2008, the "Summer Quarterly" was printed. Approximately 1,000,000 copies of the Summer Quarterly were printed.

11.    The Summer Quarterly is currently in the process of being sent to HIG's independent consultants.

12.    The consultants advise HIG how many Quarterly's they want to purchase. The Quarterly is packaged in packages of 15. By way of example, if a consultant requests five Quarterly's on her order, she will receive seventy-five Quarterly's which she will then distribute to potential customers that will buy HIG products contained in the Quarterly.

13.    The Quarterly is the driving force behind generating revenue for HIG. In other words, if the Quarterly is taken out of circulation, as Meredith requests in connection with its Motion, HIG will have no way to sell product and HIG will be destroyed.

14.    In addition to the Quarterly, on a monthly basis HIG publishes a publication only for its Consultants called "News From Home" (the "News").

15.    The circulation of the News is approximately 100,000 per month.

16.    The News contains HIG products, information for consultants, new product offerings, consultant recognition and suggestions on how to sell HIG products.

17.    Further, on a monthly basis HIG also publishes a monthly catalog (the "Monthly").

18.    The Monthly is a smaller version of the Quarterly that is sent and purchased on a monthly basis to consultants and customers.

19.    Like the Quarterly, the consultants request the Monthly in a sufficient quantity to distribute to potential customers.

20.    The circulation of the Monthly is approximately 1.2 million per month.

### THE MEREDITH-HIG RELATIONSHIP

21.    In 2003, Meredith Corporation ("Meredith") and HIG entered into a certain agreement entitled "Meredith Corporation-Home Interiors & Gifts, Inc. Strategic Alliance" (the "Agreement").

22.    Under the Agreement, HIG has a license to use Meredith's Better Homes & Gardens trademarks (the "Branding Elements") on products that are sold by HIG through its extensive network of Consultants.

23.    Initially, HIG had the ability to utilize the Branding Elements in connection with over 400 products. In 2005, the Agreement was amended to allow HIG to utilize the branding elements with over 900 products.

24.    The Agreement also contains certain exclusivity provisions for the benefit of HIG.

25.    In October 2007, Meredith announced that it had entered into a licensing agreement with Wal-Mart for a wide range of home products.  HIG believes this Agreement violates the exclusivity provisions in the Agreement.

26.    While HIG has requested the Wal-Mart contract, Meredith has declined to provide it to HIG or allow HIG to review the Wal-Mart contract so it can determine if it violates the exclusivity provisions in the Agreement.

27.    Without the exclusivity provided in the Agreement, HIG would not be able to realize the value of the Agreement and HIG's entire purpose for entering into the Agreement would be frustrated.

## MEREDITH'S APPROVAL OF PRODUCTS WITH BRANDING ELEMENTS

28.    Under the Agreement, Meredith maintains extensive control and involvement regarding the quality and type of the goods manufactured that contain the Branding Elements, as well as the print material in which any goods bearing the Branding Elements will appear.

29.    With respect to products that utilize the Branding Elements, Meredith has to approve any product with the Branding Elements.

30.    Succinctly, HIG must present a product idea to Meredith and describe generally how the product will look.  HIG and Meredith work together to make any changes requested by Meredith on the product ideas which are presented in visual form in a form referred to as "storyboards."

31.    After Meredith approves the product idea on a "storyboard," HIG works with an independent manufacturer to manufacture a model or sample of the product.

32.     Ultimately, an exemplar of the product is produced known as a "Production Quality Sample" ("PQS").

33.     The PQS is then sent to Meredith for final approval before any manufacture of the product for sale begins.

34.     Once Meredith approves the PQS, HIG orders the product in accordance with the approved PQS, and HIG pays a third-party, independent manufacturer for the finished product containing the Branding Elements.

35.     Currently, HIG has $3,270,815.10 of product containing the Branding Elements that Meredith has approved, and HIG has purchased and paid for from a third-party, independent manufacturer.

36.     In addition, HIG has $1,116,874.52 of product with the Branding Elements that Meredith has approved, HIG has ordered from a third-party, independent manufacturer, and is in-transit to HIG's warehouse in Texas.

## MEREDITH'S APPROVALS REGARDING ADVERTISING AND PRINT MATERIALS

37.     In addition to the approval of all products containing the Branding Elements, Meredith is also extensively involved in reviewing and approving all advertising materials prepared and circulated by HIG to sell its products that contain the Branding Elements.

38.     For example, Meredith approves the Quarterly, the Monthly and the News.

39.     Meredith is involved throughout the process of creating, preparing and ultimately approving the version of the Quarterly, the Monthly and the News that will be circulated to Consultants and/or customers.

40.     Beginning March 6, 2008, the Quarterly for Summer 2008 was printed (the "Summer Quarterly").

41.     Meredith approved all of the Summer Quarterly, including, but not limited to, the products containing the Branding Elements and the layout of the pages containing the Branding Elements.

42.     Meredith also approved the News where their product was featured, including the News for April 2008, which was mailed to consultants on March 19, 2008.

43.     In addition, Meredith has approved the News for May 2008.

44.     A copy of Meredith's approval for the May News is attached as Exhibit 1 hereto.  Meredith approved the May News on March 19, 2008.

45.     Meredith has also approved the Monthly for April and May 2008.

46.     The May Monthly has a product with the Branding Elements on the cover.

47.     HIG's use of products with the Branding Elements was known to Meredith at all times and expressly approved by Meredith, including after the filing of this litigation.

### HIG AND MEREDITH'S OTHER CONTRACTUAL RELATIONSHIPS

48.     HIG and Meredith have other contractual relationships besides the Agreement at issue in this litigation.

49.     HIG and Meredith have a contract relating to the paper, printing, freight and postage for its catalogs (the "Paper Contract").

50.     Under the Paper Contract, payment for paper charges is due prior to the press date or 30 days from the invoice date, whichever is sooner.

51.     The parties practice under the Paper Contract has always been that HIG paid Meredith within 30 days from the invoice date for the paper.  In other words, HIG paid Meredith for the paper after the catalog in question was printed and shipped.

52.     On March 6, 2008, the Summer Quarterly went to press.

53.     On March 6, 2008, Meredith demanded the invoice for paper be paid in full at the press date or it would not print the Summer Quarterly.

54.     This was the first time that Meredith ever demanded that HIG pay in advance for the paper to print a Quarterly.

55.     As a result of Meredith's requirements, and demand that payment be made or Meredith would not print the Summer Quarterly, HIG paid Meredith $736,562.38 for paper to ensure timely printing and production of the Summer Quarterly.

56.     As discussed above, approximately one-million copies of the Summer Quarterly were printed.

57.     The Summer Quarterly has been shipped to Consultants and by Friday, April 11, 2008, approximately five hundred thousand copies will be in circulation.

## MEREDITH'S REQUESTED RELIEF WOULD BE DEVASTATING TO HIG

58.     I have reviewed the Proposed Injunction Attached to Meredith's Motion for Preliminary Injunction.

59.     Meredith seeks to have the Court order HIG to return, at HIG's expense, all products and catalogs and other materials that have the Branding Elements.

60.     The requested relief would require HIG to return in excess of $3.2 million of product containing the Branding Elements that HIG purchased from independent, third party manufacturers after express approval from Meredith.

61.    Meredith has never stated or advised HIG that the Branding Elements on any of these products are not approved or there are quality issues with these products.

62.    In addition to the return of genuine product that has been purchased from third-party manufacturers, HIG's requested relief would force HIG to incur substantial out of pocket costs.

63.    As of the date of this declaration, HIG is unable to determine how many Quarterly, Monthly and News publications are in circulation with products containing the Branding Elements.

64.    HIG has, however, determined that the postage to have Consultants return Quarterly publications would be at least $4.60 per package.

65.    For just the Summer Quarterly alone, it would cost HIG approximately $2,300,000.00 in postage to obtain the half-million copies of the Summer Quarterly that are already, or are scheduled to be, in circulation by Friday, April 11, 2008.

66.    Meredith's requested relief would also effectively destroy HIG.

67.    HIG's sales revenue is driven by the Quarterly, the Monthly and the News. If all those publications are taken out of circulation, HIG will have no way to generate sales of its products.

68.    It should also be noted that products containing the Branding Elements in the Summer Quarterly, for example, represent a small portion of the products for sale by HIG through its Consultants.

69.    On a percentage of total pages, pages containing the Branding Elements represent 21.5% of the pages in the Summer Quarterly.

70. On a percentage of total products, products containing the Branding Elements constitute 14.1% of the total products in the Summer Quarterly.

71. On a percentage of revenues, the revenues generated from sales of products containing the Branding Elements represent 9.4% of the total revenues from all products in the Summer Quarterly.

72. Meredith approved all the current Quarterly, Monthly and News publications in circulation containing the Branding Elements. Similarly, it approved all of the products containing the Branding Elements in HIG's possession or in-transit that HIG purchased from independent, third-party manufacturers.

73. If Meredith is granted the relief it seeks, it will make it impossible for HIG to continue as a going concern.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this ____ day of April 2008.

Shari Gustafson

# EXHIBIT 1



# APPROVAL FORM

**Date: March 19, 2008**

Submitted by:  Company name: Home Interiors, Inc.

Contact name:  Catalina Deltoro
1649 Frankford Road West
Carrollton, TX 75007-4605
Tel: 972-695-1672
Fax: 972-695-1068
E-mail: cdeltoro@homeinteriors.com

Submitted to:  ___ Tami Beachem
Brand Licensing
1716 Locust Street, LS-203
Des Moines, IA 50309
Tel: 515-284-2904
Fax: 515-284-3182
E-mail: tami.beachem@meredith.com

Description of brand use: _____

Better Homes and Gardens Collection represented in:
☐ Quarterly Catalog: _____
☐ BHG Collection Catalog  Issue: _____  ☐ Display Ad for _____
☐ Presentation Section: _____  ☐ Art/Accessory Guide
☐ Hispanic Companion Piece:
☐ Monthly Catalog  Issue:
☒ The News From Home Magazine: <u>Page 10-11 May 2008 The News From Home Magazine</u>

This is: ☒ First Draft        ☐ Second Draft w/revisions        ☐ Final Draft

☐ Other: _____

**Final approval needed by: 3-25-08**

☐ XApproved as submitted ☐  Approved with Changes    ☐   Resubmit with Revisions    ☐  Not Approved

Comments:

Approval Signature: *Tami Beachem* _____        Date: 3/19/08 _____

Do materials need to be returned?  ☐ Yes   ☐ No    By when: _____
Expedited return?        ☐ Yes  ☐ No
Express shipping courier and number: _____

*Updated 10/22/07.*

# EXHIBIT B

# **M**eredith
CORPORATION

1716 Locust Street
Des Moines IA 50309-3023
Ph: 515-284-2786
Fax: 515-284-3933
E-mail: john.zieser@meredith.com

**John S. Zieser**
Chief Development Officer
General Counsel and Secretary

February 8, 2008

**VIA E-MAIL
AND FEDERAL EXPRESS - OVERNIGHT**

Richard W. Heath
President / CEO
Home Interiors & Gifts, Inc.
1649 Frankford Road West
Carrollton, Texas 75007

Re:    Meredith Corporation – Home Interiors & Gifts, Inc. Strategic Alliance
June 8, 2003 (the "Agreement")

Dear Mr. Heath:

As you know, Home Interiors & Gifts, Inc. (HIG) has failed to deliver its quarterly
royalty statement and payment, both of which were due on January 30, 2008.
Accordingly, HIG is delinquent and in material breach of its payment and reporting
obligations under the Agreement. This letter provides written notice of Meredith
Corporation of the same, as well as Meredith's demand that HIG immediately remedy
this breach. Specifically, Meredith hereby demands:

- Immediate delivery of the written reports HIG is required to provide under
  Section 4.3 (Royalty Statements) of the Agreement; and
- Immediate payment of the royalties HIG is required to pay under Section G of
  the License Summary of the Agreement, including the payment of one million
  dollars ($1,000,000.00), which is the Guaranteed Annual Minimum Royalty due
  and owing for the quarter ended December 31, 2007; and
- Interest on the aforementioned delinquent royalties at the rate of twelve percent
  (12%) per annum from the date that is ten (10) days following the date such
  payment became delinquent (February 9, 2008), per Section 4.1.3 of the
  Agreement.

Immediate payment should be made via wire transfer to Meredith Corporation's account
0289646226 at Wells Fargo Bank Iowa, N.A., ABA 073000228.

As you are also aware, Section 4.3.2 of the Agreement requires, and Meredith hereby
demands, prompt delivery of a detailed written statement prepared and certified by HIG's
Chief Financial Officer setting forth the number and description of Licensed Products

**Magazine Publishing • Book Publishing • Television Broadcasting • Integrated Marketing**

Richard W. Heath
Page Two
February 8, 2008

sold, gross sales price, and net sales price of the Licensed Product(s) distributed and/or sold by HIG with respect to the last two (2) years of operations, up to and including the date of this demand.

Take note as well that HIG's breach of the Agreement provides Meredith with grounds to terminate the Agreement at its option, and Meredith reserves its rights to do so and to seek damages for breach of the Agreement. In addition, pursuant to Sections 5.2.1, 5.4.1 and 5.4.2 of the Agreement, in the event that Meredith terminates the Agreement for HIG's failure to pay the sums owed, all rights of HIG to continue to use the Meredith Branding Elements in its promotion and sale of Licensed Products shall immediately terminate. Lastly, under Section 11 of the parties' Agreement, Meredith reserves the right to restrain any such breach of the Agreement by equitable relief.

This letter is an attempt to collect a debt and any information obtained will be used for that purpose.

As a courtesy, Meredith will afford HIG until 12:01 p.m. on the Wednesday, February 13, 2008 (five days) to remedy the foregoing matters.

PLEASE TAKE NOTICE AND GOVERN YOURSELF ACCORDINGLY.

Very truly yours,

John S. Zieser

cc:    Ed Mosley
       Vice President
       Home Interiors & Gifts, Inc.
       1649 Frankford Road West
       Carrollton, Texas 75007

       Brian Hermes
       Vice President and General Counsel
       Home Interiors & Gifts, Inc.
       1649 Frankford Road West
       Carrollton, Texas 75007

2

# EXHIBIT C

February 13, 2008

*Via Federal Express and Facsimile (515-284-3933)*

Jack Griffin
Publishing Group President
Meredith Corporation
1716 Locust Street
Des Moines, Iowa 50309-3023

**Re:**    *Meredith Corporation-Home Interiors & Gifts, Inc. Strategic Alliance*

Dear Mr. Griffin:

On February 8, 2008, we received correspondence from Meredith Corporation ("Meredith") requesting documents, demanding payment of $1,000,000.00, and declaring Home Interiors & Gifts, Inc. ("Home Interiors") in breach of the Meredith Corporation-Home Interiors & Gifts, Inc. Strategic Alliance entered on June 8, 2003 (the "Contract"). While we are gathering and intend to produce the requested documents, although we have already provided you with many of the documents requested pursuant to the Contract, we disagree with Meredith's assertions that Home Interiors is in breach of the Contract and owes Meredith $1,000,000.00. Rather, any obligation to pay Meredith Corporation any sum of money under the Contract ceased upon Meredith Corporation's prior material breaches of the Contract, which we discussed prior to you sending your February 8th letter and which are set forth in more detail below.

To begin with, Meredith has breached the Contract by recently entering into a licensing agreement with Wal-Mart which has rendered it impossible for Home Interiors to meet its Net Sales figures under the Contract. Although Meredith has refused, upon request, to produce the agreement with Wal-Mart, we believe that the Wal-Mart licensing agreement infringes the express terms of section J(1) of the Contract, as amended on November 13, 2006, in that Wal-Mart has been licensed to sell prohibited items including: (1) clocks; (2) outdoor wall artwork and mirrors; (3) artificial florals; and (4) "product lines" in which decorative candles, garden accessories, tableware, potpourri, reed diffusers, and room fragrances constitute more than 50% of the items in the line. We hereby demand that you produce all documents representing the terms of the licensing agreement between Meredith and Wal-Mart so that we can further evaluate the extent to which Meredith has violated the Contract.

Meredith has further violated the Contract in that Meredith has not, as required by section F(1), provided a link to Home Interiors' website on *www.bhg.com*. This action by Meredith,

Jack Griffin
February 13, 2008
Page 2

along with other actions. has made it very difficult for Home Interiors to procure sufficient Net Sales to meet its Annual Minimum Royalty Payments or to otherwise profit under the Contract Meredith's refusal to provide a link to Home Interiors' website, along with other actions constitutes a breach of Meredith's promotional commitments under Section F of the Contract.

These breaches not only violate the express terms of the Contract, but also violate Iowa's Implied Covenant of Good Faith and Fair Dealing. which is implied in all Iowa contracts. The implied covenant requires a party in control to exercise discretion in a manner which avoids harm to the other party and to avoid acting in a manner offensive to community standards of reasonableness. fairness, and decency. *Kopple v. Schick Farms, Ltd*, 447 F. Supp. 2d 965. 981-82 (N.D. Iowa 2006). Further. it has been held that. under Iowa law. the duty of good faith can be breached even if a party complies with the express and unambiguous terms of a contract if that party acts in bad faith or engages in other inequitable conduct contrary to an agreed common purpose or inconsistent with the justified expectations of the other party. *MidAmerican Energy Co. v. Great Am. Ins. Co.*, 171 F. Supp. 2d 835. 854 (N.D. Iowa 2001).

We believe that any Court applying Iowa law. which governs the Agreement. would find that Meredith's actions, as set forth above. violate both the express terms of the Contract and the Implied Covenant of Good Faith and Fair Dealing. Meredith's actions have harmed Home Interiors by greatly compromising the exclusive appeal of Home Interiors' Better Homes and Gardens products which are now. due to Meredith's actions. available at Wal-Mart stores throughout the country and will be even more prevalent in the coming months. Meredith's licensing agreement with Wal-Mart violates the common purpose of the Contract and is inconsistent with Home Interiors' justified expectations of an exclusive market when entering the Contract.

We hereby. therefore, pursuant to Section 5.3.1 of the Contract. provide notice that Meredith is in breach of the Contract. as set forth above. While we hope to work towards an amicable resolution to these disputes, in the event that no resolution is reached within 45 days of the date of this letter. the Contract will be terminated based on Meredith's breaches of the Contract. and Home Interiors reserves the right to seek damages for breach of contract and breach of the Implied Covenant of Good Faith and Fair Dealing.

We look forward to discussing a resolution of these disputes with you and invite you to contact me at your earliest convenience to discuss these matters further.

Jack Griffin
February 13. 2008
Page 3

Sincerely:

Brian Hermes
Vice President and General Counsel
Direct Phone Number: (972) 695-1085
Direct Fax Number: (214) 731-2928
bhermes@homeinteriors.com


cc:    John S. Zeiser
       Chief Development Officer
       General Counsel and Secretary
       Meredith Corporation
       1716 Locust Street
       Des Moines. Iowa 50309-3023

TRANSMISSION VERIFICATION REPORT

```
TIME  : 02/13/2008 12:29
NAME  : HOME INTERIORS
FAX   : 972-695-1008
TEL   : 972-695-1000
SER.# : BROG3J524908
```

```
DATE,TIME          02/13  12:27
FAX NO./NAME        915152843933
DURATION           00:01:41
PAGE(S)            04
RESULT             OK
MODE               STANDARD
                   ECM
```



## FACSIMILE TRANSMITTAL SHEET

| TO | FROM |
|---|---|
| Jack Griffin, President | Brian Hermes |

| COMPANY | DATE |
|---|---|
| Meredith Corporation | 2/13/2008 |

| FAX NUMBER | TOTAL NO. OF PAGES INCLUDING COVER |
|---|---|
| 515-284-3933 | 4 |

| PHONE NUMBER | SENDER'S REFERENCE NUMBER: |
|---|---|
| | 972-695-1085 |

| RE: | YOUR REFERENCE NUMBER: |
|---|---|
| Home Interiors & Gifts | |

☑ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

NOTES/COMMENTS

# EXHIBIT D

 **eredith**
CORPORATION

716 Locust Street
Des Moines, IA 50309-3023
Ph: 515-284-2786
Fax: 515-284-3933
E-mail: john.zieser@meredith.com

**John S. Zieser**
Chief Development Officer
General Counsel and Secretary

February 15, 2008

Brian Hermes, Esq.
Vice President and General Counsel
1649 Frankford Road West
Carrollton, Texas 75007

Re:    Meredith Corporation – Home Interiors & Gifts, Inc. Strategic Alliance
        June 8, 2003 (the "Agreement")

Dear Mr. Hermes:

This letter is an initial response to your February 13, 2008 12:27 p.m. fax letter to Jack Griffin.

We view your allegations of Meredith's breach of the Agreement as a subterfuge.

 As you clearly told Norbert Kaut and me in our phone call Friday, February 8, you have been instructed to renegotiate our Agreement and your February 13 letter is simply an attempt to concoct a basis – however frivolous – for such renegotiation.  Meredith has been at all times in strict compliance with our Agreement and, on several occasions, Meredith has in good faith accommodated Home Interiors & Gifts, Inc. (HIG) and extended significant benefits to HIG even though Meredith was not required to do so.

For this and other good reasons, we believe it is important to bring the matter to a head sooner, rather than later.  Accordingly, Meredith has filed an action in the U.S. District Court for the District of Columbia per the venue provision (section 11) of the Agreement.  As a courtesy, I've attached a copy of the Summons and Complaint.  Please respond to this email to let me know if you will accept service in this manner.

Your letter and the course of conduct of HIG since the current management was installed seem consistent with a desire and intent by HIG to terminate the Agreement.  If we have misread your intentions, please clarify so that we can better understand how to come to an expeditious resolution of this matter.  Please also indicate HIG's intentions with respect to use of the Branding Elements (as that term is defined in the Agreement) going forward.

Finally, HIG should address any further correspondence or communication regarding this matter to me or Norbert Kaut.

Very truly yours,

John S. Zieser

CC:    Jack Griffin
        Norbert W. Kaut, Esq.
        Michael Hayes, Esq
        Jim Sawtelle, Esq.

**Magazine Publishing • Book Publishing • Television Broadcasting • Integrated Marketing**

# EXHIBIT E

Better Homes and Gardens - home decorating and remodeling ideas, gardening, recipes, and more    Page 1 of 2

 **FREE YEAR + 2 FREE GIFTS** *More*  Watch Video **Better.tv**

myBHG | Login | Join Now!    Subscribe  Customer Service  Help    ›Search ⦿ Recipe ○ Site    Search



### MAKEOVER OF THE WEEK
# Kitchen Cabinets Reinvented

9 creative cabinet updates ▸
30 low-cost cabinet makeovers ▸
More great kitchen updates ▸

ADVERTISEMENT



 **Weekly Update Newsletter** FREE
Get our favorite decorating and remodeling ideas, recipes, and gardening tips via email each week.

First Name | Email Address
Get the newsletter

 Try This! | Better.tv | Top Tools

## Home Improvement
The Latest Looks in Cabinets
Picture these fresh new looks in your kitchen or bath

 View Slide Show ›

More slide shows

## Gardening
Best Trees & Shrubs for 2008
From eye-catching color to impressive disease resistance

 View Slide Show ›

More slide shows

## Food & Recipes
Chicken Leftovers Transformed
These easy chicken leftovers rank high in flavor and convenience

 View Slide Show ›

More slide shows

### Share My Garden!
See other gardener's ideas and share your own!

Share My Garden!
View this tool



| Today's Blog | Tools & Guides |
| --- | --- |
|  **Home Plans** | |
|  **Color-a-Home** | |
|  **Living Green** | |

| Today's Blog | Tools & Guides |
| --- | --- |
|  **Plant Finder** | |
| **Garden Plans** | |
| **Arrange-a-Deck** | |

| Today's Blog | Tools & Guides |
| --- | --- |
|  **Recipe Index** | |
|  **Roasting Guide** | |
|  **Meal Ideas** | |

All Top Tools

Sponsored Links
Choose Kissimmee for an exceptional Central Florida vacation! ChooseKissimmee.com !
Shop the BHG.com Store for Gardening, Home Décor and Gifts!
Special Products & Promotions from Better Homes & Gardens Magazine
Click here for great deals, discounts and prices

### BHG.com
Videos | Store | Tools | Forums | Sweepstakes | Free Newsletters | Free Offers | Home Shopping Mall
Help | Customer Service | Member Benefits | Join Now! | Log In | About Us | Advertise on BHG.com | Content Licensing
Subscribe | Renew Your Subscription | Update Your Account | Give a Gift | Better Homes and Gardens Magazine Media Kit

### Home and Family Network
Ladies' Home Journal | Parents | Fitness | MORE | Midwest Living | Country Home | Traditional Home | Better Recipes
Scrapbooks Etc. | TravelMeredith | Outdoor Living Ideas | Do It Yourself | Remodel | Kitchen and Bath Ideas | Quilting | Garden Ideas
Decorating Ideas | Remodeling Tips | Home Improvement | Landscaping Ideas | Free Recipes | Better.tv | Parents.tv

Brand Licensing Partners: Home Interiors | QB Industries | Chief Architect

© Copyright 2008  Meredith Corporation. All Rights Reserved | Privacy Policy | By using this site, you agree to our Terms of Service.

  

Case 1:08-cv-00257-RBW    Document 15-6    Filed 04/09/2008    Page 3 of 3



## Decorating

**Cheap & Chic Decorating Tips**
Get style on the cheap with these
money-saving ideas

Fast & Fabulous Projects

Fresh, Frugal Cottage Decor

19 Ideas for Flea Market Finds



## Health & Family

**Feel Better Now!**
Breeze through cold and flu season
with these simple get healthy tips

Natural Cold & Flu Remedies

Beat Your Bug

How to Get More Rest



## Crafts

**Simple Sewing Projects**
Fun and creative sewing projects for all
skill levels

Fun-to-Make Totes, Purses & Bags

Aprons! All the Craze

Punch Up Plain Pillows



## FREE Desktop Widget

Download now
Our best recipes, tools, and blogs are
just a click away

**Clip It!**

Clip your favorite BHG.com content
and save it to one convenient
location

Learn More



## What's your gardening priority this year?

( ) Annuals for lots of color

( ) A perennial bed

( ) Healthy home grown vegetables

( ) Getting started!

# EXHIBIT F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MEREDITH CORPORATION,  )
1716 Locust Street  )
Des Moines IA 50309-3023  )
)
Plaintiff,  )
)
vs.  )
)
HOME INTERIORS & GIFTS, INC.,  )
1649 Frankford Road West  )
Carrollton, TX 75007  )
)
Defendant.  )
)
)

Case: 1:08-cv-00257
Assigned To : Walton, Reggie B.
Assign. Date : 2/15/2008
Description: General Civil

## COMPLAINT

Plaintiff Meredith Corporation, for its Complaint against Defendant Home Interiors & Gifts, Inc., states as follows:

### Jurisdiction and Venue

1.      The Court has jurisdiction over Counts I, IV and V of the Complaint pursuant to 28 U.S.C. § 1332, in that the parties are corporations of different states and the amount in controversy exceeds $75,000.  This Court has jurisdiction over Counts II and III of the Complaint pursuant to 28 U.S.C. § 1331 (in that they are claims arising under the laws of the United States), 15 U.S.C. § 1121 (in that they are claims arising under The Lanham Act), and 15 U.S.C. § 1338(a) (in that they are claims arising under an Act of Congress relating to trademarks).

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (c) and pursuant to agreement of the parties.

### Parties

3.     Plaintiff Meredith Corporation ("Meredith") is a corporation organized and existing under the laws of the State of Iowa, with its principal corporate offices located in the City of Des Moines, Iowa.

4.     Defendant Home Interiors & Gifts, Inc. ("HIG") is a corporation organized and existing under the laws of the State of Texas, with its principal corporate offices located in the City of Carrollton, Texas.

### Background

#### A.     Meredith's Trademark Rights.

5.     Founded in 1902, Meredith Corporation is one of the nation's leading marketing and media companies. Meredith's businesses include magazine publishing, television broadcasting, integrated marketing and interactive media. Meredith is the leading publisher serving women, reaching over 75 million women every month. *Better Homes and Gardens*®, Meredith's flagship and most valuable brand, is one of the most recognized and trusted brands in America. The *Better Homes and Gardens*® magazine itself, founded in 1922, is today one of the largest magazines in the U.S., reaching over 40 million households each month. In 2007, the *Better Homes and Gardens*® magazine was named "Magazine of the Year" by Advertising Age. In addition, over the years, Meredith has successfully extended the *Better Homes and Gardens*® brand across a wide variety of media platforms to serve the female consumer, providing information and inspiration in the home and family areas. For example, Meredith sells over 200 special interest publications under the *Better Homes and Gardens*® brand; it publishes numerous books under the brand, led by the *Better Homes and Gardens*® *Cookbook*, which originally launched in 1932, and is one of the best selling non-fiction books of all time; *BHG.com* is the

2

leading home destination Internet portal in the U.S., attracting over 5 million unique visitors each month; and Meredith has recently launched both mobile programs and an Internet broadband network under the *Better Homes and Gardens*® brand.

6.    As the owner and publisher of *Better Homes and Gardens*® magazine, Meredith is also the owner and holder of the *Better Homes and Gardens*® trademark. Meredith's *Better Homes and Gardens*® trademark is federally registered with the United States Patent and Trademark Office for monthly publications (U.S. Reg. No. 203,616, issued Sept. 22, 1925), for a monthly magazine (U.S. Reg. No. 721, 355, issued Sept. 12, 1961 and U.S. Reg. No. 754, 656, issued Aug. 13, 1963) and for periodically printed publications, namely magazines featuring articles and information of general interest subject matter (U.S. Reg. No. 2802181, issued Jan. 6, 2004). Meredith has obtained additional federal registrations for the *Better Homes and Gardens*® mark for a variety of other goods and services relating to the home, home improvement, home décor, gardening and cooking and for products found in the home (including U.S. Reg. Nos. 1127616, 1127617, 1155530, 1496734, 1573340, 1581260, 2701851, 2868633, 3316564, 2866924, 2979393, 2921793, 3091374, 3091375, 3091547, 3166378, 3256938 and 3277245). (The foregoing marks shall be referred to, collectively, as the "Better Homes and Gardens® Marks").

7.    Since at least as early as September 16, 1968, Meredith has used a "Plaid Checker Board" design mark to promote its goods and services. That mark is also federally registered with the United States Patent and Trademark Office (U.S. Reg. No. 1,231,837, issued Mar. 22, 1983). (The *Better Homes and Gardens*® Marks and the Plaid Checker Board design mark shall be referred to, collectively, as the "Meredith Marks").

3

8.    The federal registrations for the *Better Homes and Gardens*® mark for publications and for various of the other goods and services described above and the Plaid Checker Board design mark are incontestable within the meaning of the Lanham Act.

9.    Meredith's use of the Meredith Marks has been continuous and the sale of products under the Meredith Marks have been substantial. Meredith has invested a substantial amount of time, money and other resources to promote, advertise and protect the Meredith Marks and the products and services sold thereunder.

10.    As a result of Meredith's sales and promotion of products and services under the Meredith Marks, the Meredith Marks have acquired, in the minds of the public, a secondary meaning and have become distinctive marks denoting authenticity, care, skill, industry, reliability, and high quality to the eye and mind of the public. As a further result of sales and promotion of its products and services under the Meredith Marks, the Meredith Marks are generally recognized by the public as being associated exclusively with the goods and services of Meredith.

11.    Because of such reputation and public awareness, Meredith has established valuable goodwill in connection with sales and promotion of its products and services under the Meredith Marks, and said marks have become famous. The goodwill associated with the Meredith Marks is one of Meredith's most valuable assets.

12.    As the owner of the Meredith Marks, Meredith is authorized to enter into license agreements with third parties (licensees). These license agreements generally allow licensees to utilize the Meredith Marks in connection with the promotion and sale of the licensees' products or services, conditioned upon and subject to the provisions in those agreements. The use of the Meredith Marks by licensees is subject to the control of Meredith and all such use of the

4

Meredith Marks inures to the benefit of Meredith. By way of example, since at least 1998, Meredith has licensed Wal-Mart to use the *Better Homes and Gardens*® mark in connection with outdoor living and other products.

      B.    **Agreement with HIG.**

      13.    HIG is engaged in the manufacture, promotion and sale of home decorating products.

      14.    In approximately 2003, HIG approached Meredith with a request for a license to use the Meredith Marks in connection with the promotion and sale of its products within a specific territory and channels of distribution.

      15.    On June 8, 2003, Meredith and HIG entered into the "Meredith Corporation— Home Interiors & Gifts, Inc. Strategic Alliance," including certain "Terms and Conditions" (collectively, the "Agreement") providing for the grant to HIG of a limited license to use the Meredith Marks for home decorative products (many of which are the subject of the federal registrations or pending applications for registration of the Meredith Marks), in accordance with the specific terms of the Agreement. The license grant to HIG and Meredith's permission for HIG to continue to use the Meredith Marks is conditioned upon and subject to HIG's compliance with the terms and conditions of the Agreement, including the provisions for payment of royalties.

      16.    The Agreement was subsequently amended on four occasions. Among other things, these amendments generally accommodated HIG's requests to increase the number of its products that could be promoted through the use of the Meredith Marks.

      17.    In consideration of the grant of its license, the Agreement requires HIG to pay certain minimum royalties to Meredith ("Guaranteed Annual Minimum Royalty") in specific

amounts and according to the terms set forth in the Agreement. The Agreement further requires HIG to pay Meredith royalties calculated on net sales of licensed products, based on written reports, which HIG is required to provide to Meredith.

18.    Pursuant to the Agreement, for calendar year 2007, HIG was required to pay a Guaranteed Annual Minimum Royalty in the amount of three million five hundred thousand dollars ($3,500,000).

19.    Notwithstanding the express terms of the Agreement, HIG has failed to pay one million dollars ($1,000,000) of its Guaranteed Annual Minimum Royalty for 2007, which amount was due as of January 30, 2008.

20.    On February 8, 2008, Meredith provided HIG formal notice of its default under the Agreement and demanded payment of the past due amounts. Meredith further demanded immediate delivery of the above-referenced reports that HIG is required to provide pursuant to the Agreement.

21.    Despite Meredith's demand for payment and reports pursuant to the Agreement, HIG has failed and refused to tender such payment and has failed to tender such reports. Despite such failures, it continues to use the Meredith Marks in connection with the promotion and sale of its products to the public.

## COUNT I

### (BREACH OF CONTRACT)

22.    Meredith realleges and incorporates by reference Paragraphs 1-21, inclusive, as though fully set forth herein.

23.    Meredith has fully performed all of its obligations under the Agreement.

24.    HIG has breached the Agreement by, among other things, failing and refusing to provide payment of the royalties required to be paid pursuant to the Agreement, by failing to

deliver the written reports it is required to make pursuant to the Agreement, and by continuing to use the Meredith Marks in connection with the promotion and sale of its products to the public, despite its failure to pay the Guaranteed Annual Minimum Royalty for 2007.

25.    Meredith has sustained and continues to sustain monetary and other damages as a direct and proximate result of HIG's breach.

## COUNT II

## (LANHAM ACT - TRADEMARK INFRINGEMENT – REGISTERED MARKS)

26.    Meredith realleges and incorporates by reference Paragraphs 1-25, inclusive, as though fully set forth herein.

27.    This Count arises under Section 32(1)(a) of the Trademark Act of 1946, as amended ("Lanham Act"), 15 U.S.C. § 1114(1)(a).

28.    The license grant to HIG and Meredith's permission for HIG to continue to use the Meredith Marks is conditioned upon and subject to HIG's compliance with the terms and conditions of the Agreement, including the provisions for payment of royalties and the delivery of the written reports it is required to make pursuant to the Agreement. However, HIG has failed to pay one million dollars ($1,000,000) of its Guaranteed Annual Minimum Royalty for 2007, which amount was due as of January 30, 2008, and failed to deliver the written reports it is required to make pursuant to the Agreement. Therefore, until HIG makes the required payment and delivers the required reports under the Agreement, it is not authorized to use the Meredith Marks.

29.    HIG's unauthorized use of the federally registered Meredith Marks creates the likelihood that the public will be confused as to the source, sponsorship or affiliation of the goods of HIG, or will be led to believe mistakenly that the use of the Meredith Marks by HIG is

7

licensed or otherwise authorized, when, in fact, it is not, as a result of which Meredith and the public have been, and are likely to be further, irreparably damaged.

### COUNT III

### (LANHAM ACT - COMMON LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION)

30.    Meredith realleges and incorporates by reference Paragraphs 1-29, inclusive, as though fully set forth herein.

31.    This Count arises under Section 43(a) of the Trademark Act of 1946, as amended ("Lanham Act"), 15 U.S.C. § 1125(a).

32.    The license grant to HIG and Meredith's permission for HIG to continue to use the Meredith Marks is conditioned upon and subject to HIG's compliance with the terms and conditions of the Agreement, including the provisions for payment of royalties and the delivery of the written reports it is required to make pursuant to the Agreement. However, HIG has failed to pay one million dollars ($1,000,000) of its Guaranteed Annual Minimum Royalty for 2007, which amount was due as of January 30, 2008, and failed to deliver the written reports it is required to make pursuant to the Agreement. Therefore, until HIG makes the required payment and delivers the required reports under the Agreement, it is not authorized to use the Meredith Marks.

33.    HIG's unauthorized use of the Meredith Marks create the likelihood that the public will be confused as to the source, sponsorship or affiliation of the goods of HIG, or will be led to believe mistakenly that the use of the Meredith Marks by HIG is licensed or otherwise authorized, when, in fact, it is not, as a result of which Meredith and the public have been, and are likely to be further, irreparably damaged.

8

34.    The unauthorized use by HIG of the Meredith Marks is a false designation of origin as to any goods or services sold, advertised or promoted by HIG and constitutes unfair competition.

35.    HIG's aforesaid acts infringe Meredith's rights; tend to represent falsely that HIG's goods are legitimately connected with Meredith; tend to describe falsely that HIG's goods emanate from or are authorized, sponsored or approved by Meredith; create the likelihood that the public will be confused as to the source, sponsorship or affiliation of the goods of Meredith and HIG, and tend to designate falsely that HIG's goods originate from Meredith, all of which constitute violations of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as a result of which Meredith and the public have been, and are likely to be further, irreparably damaged.

<u>COUNT IV</u>

**(COMMON LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION)**

36.    Meredith realleges and incorporates by reference the allegations of paragraphs 1-35, inclusive, as though fully set forth herein.

37.    This Count arises under the common law of trademark infringement and unfair competition.

38.    By its above enumerated acts, HIG has unlawfully violated and infringed the rights of Meredith in the Meredith Marks, created the likelihood that the public will be confused as to the source, sponsorship or affiliation of the goods of HIG, or will be led to believe mistakenly that the use of the Meredith Marks by HIG is licensed or otherwise authorized, when, in fact, it is not, as a result of which Meredith and the public have been, and are likely to be further, irreparably damaged.

9

## COUNT V

### (DEMAND FOR ACCOUNTING)

39.    Meredith realleges and incorporates by reference Paragraphs 1-38, inclusive, as though fully set forth herein.

40.    Pursuant to the Agreement, HIG is required to provide Meredith with written reports upon which Meredith can then determine the amount of net sales and royalties to be paid, following the end of each accounting quarter.

41.    Further pursuant to the Agreement, upon Meredith's request, HIG is required to provide a detailed written statement with respect to the prior two years of operations, prepared and certified by HIG's chief financial officer, indicating the number and description of Licensed Products (as that term is defined in the Agreement) sold, gross sales price, and net sales price of the Licensed Products distributed and/or sold by HIG, up to and including the date upon which Meredith made such request.

42.    Meredith has properly made such a request to HIG pursuant to the terms of the Agreement, but HIG has failed to comply with said request.

43.    The Agreement further provides that the amount of royalty due Meredith is the greater of the amount as computed based upon the written reports provided by HIG to Meredith, or the Guaranteed Annual Minimum Royalty. Such amount cannot be determined without the production of the above-referenced written reports from HIG.

44.    HIG has breached the Agreement by failing to provide the written reports it is required to make, and further by failing to tender the Guaranteed Annual Minimum Royalty now due, and Meredith respectfully requests that the Court issue an Order requiring HIG to provide the accounting and reporting to Meredith, so that the correct and actual royalty amount now due can be assessed and determined.

10

WHEREFORE, Meredith prays the Court enter an Order:

(1) enjoining and restraining HIG, until it has made all payments required under the Agreement (including the Guaranteed Annual Minimum Royalty for 2007) and delivered in good faith to Meredith the written reports it is required to make pursuant to the Agreement, from its continuing breach of the parties' Agreement, including any further use of the Meredith Marks, as more fully described herein, including:

(a) using the Meredith Marks or any term or design confusingly similar thereto as a part of a trademark or service mark alone or in combination with other words, names, headings, styles, designs, titles or marks in connection with selling, offering or advertising any goods or services;

(b) holding itself out as a company authorized to use the Meredith Marks or any marks confusingly similar to the Meredith Marks;

(c) performing any actions or using any words, names, headings, styles, designs, titles or marks, which are likely to cause confusion, to cause mistake or to deceive; or to otherwise mislead the trade or public into believing that Meredith and HIG are in some way connected; or that Meredith is a sponsor of HIG; or that HIG is in some manner affiliated or associated with or under the supervision or control of Meredith; or that the goods or services of HIG originate with Meredith or are conducted or offered with the approval, consent or authorization, or under the supervision of Meredith; or are likely in any way to lead the trade or the public to associate HIG with Meredith; or

(d) using any trade practices whatsoever including those complained of herein, which tend to compete unfairly with or injure Meredith's business and the goodwill attached thereto.

11

(2) requiring that HIG, until it has made all payments required under the Agreement (including the Guaranteed Annual Minimum Royalty for 2007) and delivered in good faith to Meredith the written reports it is required to make pursuant to the Agreement, deliver up to Meredith, at HIG's own expense, all goods, boxes, packaging, stationery, business forms, signs, advertisements, brochures, promotional materials and other written materials that bear the Meredith Marks or any words, names, headings, styles, designs, titles or marks confusingly similar to the Meredith Marks, together with all plates, molds, matrices and other means and materials for making or reproducing the same;

(3) requiring HIG to submit to an accounting pursuant to the terms of the parties' Agreement;

(4) awarding Judgment in favor of Meredith and against HIG, for all damages incurred by Meredith as a result of HIG's breach, in an amount to be determined at trial, together with interest, costs, and reasonable attorney's fees, to the fullest extent allowable by law; and

(5) for such further and additional relief as the Court deems just and equitable in the premises.

12

Respectfully submitted,

Michael D. Hays (D/C. Bar No. 932418)

Mitchell H. Stabbe (D.C. Bar No. 333427)

Dow Lohnes PLLC
1200 New Hampshire Ave., N.W.
Suite 800
Washington, D.C. 20036-6802
Telephone: (202) 776-2000
Facsimile: (202) 776-2222
mhays@dowlohnes.com
mstabbe@dowlohnes.com

Counsel for Plaintiff Meredith Corporation

Dated: February 15, 2008

13

# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MEREDITH CORPORATION** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 1:08-cv-00257** |
| | ) | |
| **HOME INTERIORS & GIFTS, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER DENYING MEREDITH CORPORATION'S
## MOTION FOR PRELIMINARY INJUNCTION

Upon consideration of the Motion for Preliminary Injunction of Plaintiff Meredith

Corporation ("Meredith") against Defendant Home Interiors & Gifts, Inc. ("HIG"), the

memoranda of points and authorities in support thereof and in opposition thereto, and the

declarations and other evidence before the Court, it is, this _____ day of April, 2008,

ORDERED that the Motion for Preliminary Injunction of Plaintiff Meredith

Corporation against Defendant Home Interiors & Gifts, Inc. is DENIED.

IT IS SO ORDERED.

_____
Honorable Reggie B. Walton
UNITED STATES DISTRICT JUDGE

Copies to:

Michael D. Hays, Esq. (mhays@dowlohnes.com)
Mitchell H. Stabbe, Esq. (mstabbe@dowlohnes.com)
Dow Lohnes PLLC
1200 New Hampshire Ave., N.W.
Suite 800
Washington, D.C. 20036-6802

James G. Sawtelle (jsawtelle@faegre.com)
Faegre & Benson, LLP
1900 Fifteen Street
Boulder, CO 80302-5414

Martin Lobel, Esq. (lobel@lnllaw.com)
Lee Ellen Helfrich, Esq. (helfrich@lnllaw.com)
Lobel, Novins & Lamont, LLP
888 17th St., N.W.
Suite 810
Washington, D.C. 2006

Scott M. DeWolf, Esq.  (sdewolf@rhmlawyers.com)
Kathleen M. Patrick, Esq. (kpatrick@rhmlawyers.com)
Rochelle Hutcheson & McCullough, LLP
325 N. St. Paul Street, Suite 4500
Dallas, Texas 75201