## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MEREDITH CORPORATION,                    )
                                         )
          Plaintiff,                     )
                                         )
     v.                                  )     Case No. 1:08-cv-00257 RBW
                                         )
HOME INTERIORS & GIFTS, INC.,            )
                                         )
          Defendant.                     )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN RESPONSE TO ORDER TO SHOW CAUSE

Of Counsel                           Michael D. Hays (D.C. Bar No. 932418)
James G. Sawtelle                    Mitchell H. Stabbe (D.C. Bar No. 333427)

Faegre & Benson, LLP                 Dow Lohnes PLLC
1900 Fifteenth Street                1200 New Hampshire Ave., N.W.
Boulder, CO 80302-5414               Suite 800
Telephone: (303) 447-778             Washington, D.C. 20036-6802
Facsimile: (303) 447-7800            Telephone: (202) 776-2000
jsawtelle@faegre.com                 Facsimile: (202) 776-2222
                                     mhays@dowlohnes.com
                                     mstabbe@dowlohnes.com

Counsel for Plaintiff Meredith Corporation

April 28, 2008

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS .....................................................................................................3

A.      Background Of Meredith And The Distinctive Trademarks At Issue. ................... 3

B.      HIG License Agreement. ...................................................................................... 5

C.      The Limited License Agreement Conditions HIG's Right To Use The
Meredith Marks On Its Royalty Payments.............................................................. 6

D.      HIG's Breach Of The Limited License Agreement................................................ 7

E.      HIG's Concessions In Its Opposition Papers.......................................................... 8

ARGUMENT.......................................................................................................................9

A.      The Limited License Agreement Conditions HIG's Continued Right To
Use The Meredith Marks Upon The Payment Of Royalties................................. 10

        1. Unambiguous Language Of The Agreement ..................................................... 11

        2. Iowa Contract Interpretation Principles ............................................................ 13

B.      Hornbook Contract Law Adopted In Iowa Establishes That HIG's Right
To Continue To Use The Meredith Marks Is Conditioned On Its Payment
Of Royalties ........................................................................................................ 16

C.      At A Minimum, The Agreement's Language, Iowa Contractual
Interpretation Principles, And Iowa Hornbook Law That Conditions HIG's
Right To Continued Use Of The Marks On Its Payment Of Royalties
Creates Factual Issues Rendering Dismissal Improper.......................................... 23

D.      It Is Undisputed That Meredith Meets The Remaining Requirements For
Establishing Its Trademark And Unfair Competition Claims................................ 24

        1. The Meredith Marks Are Valid, Distinctive Marks........................................... 24

        2. Likelihood Of Confusion ................................................................................. 25

E.      If This Court Is Inclined To Dismiss Counts II Through IV, It Should
Instead Hold Its Ruling In Abeyance Until The D.C. Circuit Has Ruled On
The Appeal Of The Denial Of The Preliminary Injunction................................... 26

CONCLUSION..................................................................................................................27

## INTRODUCTION

This memorandum responds to this Court's April 14, 2008 Order. That Order directed plaintiff Meredith Corporation ("Meredith") to show cause why Counts II, III, and IV of the complaint (essentially the trademark and unfair competition claims) should not be dismissed for failure to state a claim, based on this Court's decision rendered from the bench at the hearing on April 11, 2008. In that decision, denying Meredith's preliminary injunction motion, the Court concluded, among other things, that despite the admitted failure of defendant Home Interiors & Gifts, Inc. ("HIG") to pay Meredith $1 million in royalties it owed, HIG's use of Meredith's trademarks was not unauthorized because Meredith had not terminated the licensing agreement between them ("Limited License Agreement" or "Agreement"). The Court declined to enter a preliminary injunction partially on that basis.

As established below, Counts II through IV should not be dismissed for at least four reasons. First, the Limited License Agreement provides that HIG's payment of the royalties is a condition precedent to HIG's right to use the Meredith Marks. In this regard, the Agreement expressly states that the license grant to HIG is "subject to" HIG's compliance with the Agreement's terms, which includes the payment of royalties. Agreement § 1.1.1 (emphasis added). This construction of the "subject to" language as imposing a condition is reaffirmed by well-established principles of Iowa contract law, which governs the construction of the Limited License Agreement.

Under standard well-established contract principles, such a condition "must occur" before Meredith's performance (i.e., permitting HIG to use its marks) "becomes due." Restatement (Second) Contracts §§ 224, 225. Since it is undisputed that HIG has not paid the royalties, the condition has not been satisfied and HIG has no right to use those marks.

Second, even without this contractual language, HIG's use of the Meredith Marks is unauthorized. Iowa has adopted the Restatement (Second) Contracts § 237, which provides that a material failure to perform operates as a matter of law as the non-satisfaction of a condition:

[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time.

Here, it is undisputed that HIG's failure to pay Meredith $1 million in royalties is material. As noted above, the failure of such a condition to occur as a matter of law excuses Meredith's future performance, i.e., allowing HIG to use its marks.

Third, standard federal court civil procedure principles prelude dismissal of these claims. Dismissal for failure to state a claim cannot occur where there is a factual issue to be resolved. Thus, such dismissal would be proper only where the Court concluded that the Limited License Agreement unambiguously provided that payment of the royalties was not a condition precedent to HIG's use of the Meredith Marks. The Limited License Agreement cannot be so construed. Not only does such a construction conflict with the "subject to" language, but there is no provision in the Limited License Agreement that disavows such a condition. Given that Iowa law imposes such a condition as a matter of law, at a minimum, such express language disavowing such a condition would be required to dismiss Meredith's claims.

Finally, Meredith has appealed this Court's denial of Meredith's request for a preliminary injunction and is seeking expedited resolution of that appeal. As the Court noted in its Order to Show Cause, the basis for that Order is the same as its decision on the preliminary injunction motion: the Court's conclusion that HIG's use of the marks is not unauthorized because Meredith has not terminated the Agreement. If the Court is otherwise inclined to dismiss Meredith's trademark and unfair competition claims, Meredith respectfully requests that this Court hold in abeyance its determination on the Order to Show Cause until the Court of Appeals

2

has ruled on its appeal. Holding the decision in abeyance will provide for the more efficient conduct of this case, because if Meredith prevails on its appeal (or on its position with respect to the imposition of a condition precedent), the prior dismissal of Counts II through IV will complicate the case and pose the risk of a needless waste of the Court's and the parties' resources. For example, if Counts II through IV are dismissed, and are then reinstated, the parties will likely have to repeat various aspects of the discovery process, including re-deposing various witnesses.

## STATEMENT OF FACTS

### A.    Background Of Meredith And The Distinctive Trademarks At Issue.

Founded in 1902, Meredith is one of the nation's leading marketing and media companies.    Meredith's businesses include magazine publishing, television broadcasting, integrated marketing, and interactive media. Meredith is the leading publisher serving women, reaching over 75 million women every month. Declaration of David S. Johnson dated March 31, 2008 ("Johnson Decl.") ¶ 4 (submitted with Meredith's Motion For Preliminary Injunction).

BETTER HOMES AND GARDENS®, Meredith's flagship and most valuable brand, is one of the most recognized and trusted brands in America. Id. ¶ 5. BETTER HOMES AND GARDENS® magazine itself, founded in 1922, is today one of the largest magazines in the United States, reaching over 39 million households each month. In 2007, BETTER HOMES AND GARDENS® magazine was named "Magazine of the Year" by *Advertising Age*. Id.

In addition, over the years, Meredith has successfully extended the BETTER HOMES AND GARDENS® brand across a wide variety of media platforms to serve the consumer, providing information and inspiration in the home and family areas. Id. ¶ 6. For example, Meredith sells over 150 special interest publications under the BETTER HOMES AND GARDENS® brand; it publishes numerous books under the brand, led by the BETTER HOMES

3

AND GARDENS® COOKBOOK (which originally launched in 1932 and is one of the best selling non-fiction books of all time); it launched the BETTER HOMES AND GARDENS® website, *BHG.com,* which is the leading home magazine Internet portal in the U.S., attracting over 4 million unique visitors each month; and it has recently launched better.tv, a broadband network offering Internet users original video content and programming, under the BETTER HOMES AND GARDENS® brand. Id.

Meredith's BETTER HOMES AND GARDENS® trademark and service mark is federally registered on the Principal Register[1] of the United States Patent and Trademark Office. Id. ¶ 7; Johnson Decl. Ex. 1. Also, Meredith has numerous applications pending with the United States Patent and Trademark Office for its BETTER HOMES AND GARDENS® mark for additional goods and services. Id.; Johnson Decl. Ex. 2. The foregoing marks shall be referred to, collectively, as the "BETTER HOMES AND GARDENS® Marks".

Since at least as early as September 16, 1968, Meredith has also used a "Plaid Checker Board" design mark to promote its goods and services. Id. ¶ 8. A photograph of that mark, in use on the latest edition of the BETTER HOMES AND GARDENS® COOKBOOK, is submitted with the Johnson Declaration as Exhibit 3. The Plaid Checker Board design mark is federally registered as well with the United States Patent and Trademark Office (U.S. Reg. No. 1,231,837, issued Mar. 22, 1983). Id. ¶ 8. The BETTER HOMES AND GARDENS® Marks and the Plaid Checker Board design mark shall be referred to, collectively, as the "Meredith Marks."

Meredith's use of the Meredith Marks has been continuous and the sale of products under the Meredith Marks has been substantial. Id. ¶ 10. Meredith has invested a substantial amount

---

[1] The Patent and Trademark Office's Principal Register is reserved for marks that are either inherently distinctive or, over time and through promotion and use, have developed distinctiveness or a "secondary meaning." Lanham Act § 2(e), (f), 15 U.S.C. § 1052(e), (f).

of time, money, and other resources to promote, advertise, and protect the Meredith Marks and the products and services sold thereunder. Id.

Because of such reputation and public awareness, Meredith has established valuable goodwill in connection with sales and promotion of its products and services under the Meredith Marks, and said marks have become famous. The goodwill associated with the Meredith Marks is one of Meredith's most valuable assets. Johnson Decl. ¶ 11.

HIG's opposition to the motion for preliminary injunction did not dispute any of these facts regarding the Meredith Marks. Thus, HIG has conceded the distinctiveness and value of those marks and the fact that they are entitled to protection under the trademark laws.

## B.   HIG License Agreement.

HIG is a company engaged in the manufacture, promotion, and sale of home decorating products. It is a large, sophisticated company with over 1000 employees and annual sales in excess of $500 million. Id. ¶ 12. In approximately 2003, HIG approached Meredith with a request for a license to use the Meredith Marks in connection with the promotion and sale of certain of its products within a specific territory and specific channels of distribution. Id. ¶ 13.

On June 8, 2003, after months of negotiation during which HIG was represented by counsel, Meredith and HIG entered into the "Meredith Corporation—Home Interiors & Gifts, Inc. Strategic Alliance," which included a "License Summary" and certain "Terms and Conditions" (collectively, the "Limited License Agreement" or "Agreement"). Id. ¶ 14. The Limited License Agreement provides for the grant to HIG of a limited license to use the Meredith Marks for certain home decorative products, in accordance with the specific terms of said Agreement. Id. ¶ 15.

5

In consideration of the license grant, the Limited License Agreement requires HIG to pay

certain minimum royalties to Meredith ("Guaranteed Annual Minimum Royalty") in specific

amounts and according to the terms set forth in the Agreement. License Summary § 2; Johnson

Decl. ¶ 17. The Limited License Agreement further requires HIG to pay Meredith royalties

calculated on net sales of licensed products, based on written reports, which HIG is required to

provide to Meredith periodically. License Summary § 3; Johnson Decl. ¶ 17.

## C.    The Limited License Agreement Conditions HIG's Right To Use The Meredith Marks On Its Royalty Payments.

Not surprisingly, the license grant to HIG and Meredith's permission for HIG to continue

to use the Meredith Marks is expressly "subject to" HIG's compliance with the terms and

conditions of the Agreement, including the payment of royalties. In Section 1.1, entitled "Rights

Granted," the Limited License Agreement provides in part:

> 1.1.1. Subject to the terms and conditions of this Agreement, Meredith grants Licensee the right, during the Term, to reproduce and use the Branding Elements. . . . .

Agreement § 1.1.1 (emphasis added).

In addition, the Agreement provides that the failure to make a royalty payment is a

"material breach" (Agreement (License Summary) § G.3); that Meredith has "no adequate

remedy at law if" HIG breaches such "a material term" (Agreement (Terms and Conditions)

§ 11); and that Meredith has "the right to have any such breach restrained by equitable relief"

(Id.). Meredith "would not have agreed to license the Meredith Marks to HIG without these

clauses, and Meredith relied upon these clauses in agreeing to enter into the Limited License

Agreement." Supplemental Decl. of David S. Johnson, dated April 11, 2008 ("Supp. Johnson

Decl.") ¶ 9 (submitted with Meredith's Reply to HIG's Opposition to the Motion for Preliminary

Injunction).    The Agreement contains <u>no</u> requirement that Meredith must terminate the Agreement before obtaining equitable relief.

## D.    HIG's Breach Of The Limited License Agreement.

Pursuant to the Agreement, for calendar year 2007, HIG was required to pay a Guaranteed Annual Minimum Royalty.  Agreement (License Summary) § G; Johnson Decl. ¶ 21. Notwithstanding the express terms of the Agreement, HIG has failed to pay one million dollars ($1,000,000) of its Guaranteed Annual Minimum Royalty for 2007, which was due as of January 30, 2008.  HIG does not dispute that it has failed to pay this money.

On February 8, 2008, during a telephone conversation initiated by Meredith with HIG executives Brian Hermes (Vice President and General Counsel) and Ed Moseley (Vice President of Strategy and Restructuring) to discuss HIG's failure to tender the $1 million payment that HIG owes Meredith, these representatives stated that it was Highland Capital Management, L.P. ("Highland")[2], its parent, that had directed HIG not to make the payment.  Id. ¶ 22.  They further stated that they had been instructed by Highland to renegotiate the Limited License Agreement between HIG and Meredith and to inform Meredith that, unless Meredith is willing to renegotiate the HIG Agreement, Highland will force HIG into bankruptcy and convert the amounts owed to an unsecured claim in bankruptcy.  Id.

_____

[2]  Highland is a Dallas-based venture capital and distressed debt hedge fund.  In approximately January 2006, Highland acquired HIG's outstanding debt, which it then converted to a majority shareholder position.  Johnson Decl. ¶ 18.  According to *The Dallas Morning News*, Highland is a demanding firm known for putting intense pressure on the companies in which it invests, and employs "aggressive legal tactics" to further its business interests by "wear[ing] down its adversaries."  Id. ¶ 19.  Those tactics reportedly include "filing numerous lawsuits and forcing troubled companies into involuntary bankruptcy" if management does not promptly respond to its demands.  Id.; see "High Intensity Pays Off For Highland Capital," *The Dallas Morning News* (September 2, 2006).  Since Highland assumed a majority ownership of HIG, HIG has steadily decreased its use of and reliance on the Meredith Marks as a means to differentiate its products and drive business.  Examples are set forth in the Johnson Declaration.  See Johnson Decl. ¶ 20.

7

Following this conversation, on February 8, 2008, Meredith provided HIG formal notice of its default under the Limited License Agreement and demanded the delinquent payment and reports by noon, February 13, 2008. Id. ¶ 23. HIG refused. Despite Meredith's repeated demands for payment and reports pursuant to the Agreement,[3] prior to this litigation HIG made no further efforts to meet its contractual obligations. Id. ¶ 38. After this case was filed, HIG submitted reports that it claimed were in compliance with its reporting obligations, but has not satisfied its obligation to pay any of the royalties that are currently due. Moreover, despite such failures, HIG impermissibly continues to use the Meredith Marks in connection with the promotion and sale of its products to the public, and has given no indication that it intends to cease doing so. Id.

## E.    **HIG's Concessions In Its Opposition Papers.**

On April 2, 2008, Meredith moved for a preliminary injunction, with supporting papers and declaration. On April 9, 2008, HIG filed its opposition papers, in which it conceded virtually all of the facts essential to Meredith's Lanham Act and unfair competition claims. For example, HIG did not dispute the distinctiveness of the Meredith Marks, its continued use of the Meredith Marks, and most importantly, its failure to pay Meredith $1 million in royalties it owes.

Rather, HIG's defense rested almost exclusively on a single proposition: that its use of the Meredith Marks was not unauthorized because the payment of the royalties was not a condition precedent to its right to use the trademarks. HIG claimed that, even though the Limited License Agreement did not so specify, and despite its failure to pay the royalties, Meredith could not prevent HIG from using its marks unless it terminated the Agreement.

---

[3]    In an effort to avoid further litigation, Meredith reiterated its demand for the delinquent payment and reports in correspondence dated February 15 and March 28, 2008. Id. ¶ 37.

8

## ARGUMENT

The standards applicable to dismissal for failure to state a claim are well-established. As this Court has recently held:

> [T]his Court must construe the allegations and facts in the complaint in the light most favorable to the plaintiff and must grant the plaintiff the benefit of all inferences that can be derived from the facts alleged in the complaint.

Vila v. Inter-American Inv., Corp., 536 F. Supp. 2d 41, 45-46 (D.D.C. 2008) (Walton, J.) (citing Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)). Obviously, dismissal for failure to state a claim cannot occur unless the Court finds, as a matter of law, applying these presumptions, that there is no disputed issue of material fact, because such a finding defeats even the more rigorous test applied to a summary judgment motion.

Meredith has asserted claims against HIG for violation of Section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a) (Count II); for violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count III); and for common law trade mark infringement and unfair competition (Count IV). Under each of these provisions, a plaintiff will prevail if it demonstrates that: (1) the use of the mark is unauthorized; (2) the mark is distinctive or has acquired a secondary meaning; and (3) there is substantial likelihood of confusion between the plaintiff's mark and the alleged infringer's mark.[4]

---

[4] See, e.g., Russian Acad. of Sciences v. Am. Geophysical Union, No. Civ. 98-2165, 1998 WL 34333239, at *3 (D.D.C. Dec. 17, 1998) (Section 43(a) claim); Partido Revolucionario Dominicano (PRD) Seccional Metropolitana de Washington-DC, Maryland y Virginia v. Partido Revolucionario Dominicano, Sessional de Maryland y Virginia, 312 F. Supp. 2d 1, 11-12, 15 (D.D.C. 2004) (Section 43(a) claim) ("the essential elements are the same for either a trademark infringement or unfair competition action."); Appleseed Found. Inc. v. Appleseed Inst., Inc., 981 F. Supp. 672, 674-75 (D.D.C. 1997) (Section 32(1)(a) claim); Am. Ass'n for the Advancement of Science v. Hearst Corp., 498 F. Supp. 244, 262 (D.D.C. 1980) (because Court found clear case of trademark infringement, it was "redundant to explore further whether Hearst's actions also constitute unfair competition under . . . the common law of the District of Columbia").

As Meredith understands the Court's Order to Show Cause, it is predicated on the assumption that the Agreement does not make royalty payments a condition of HIG's continued right to use the Meredith Marks. Thus, under this theory, absent termination, HIG remains authorized to use the Meredith Marks, and thus no Lanham Act or unfair competition claims can survive without termination of the Limited License Agreement.

As demonstrated below, this assumption fails (and the Lanham Act and unfair competition claims should not be dismissed) for at least three reasons. First, the Limited License Agreement expressly conditions HIG's continued right to use the marks on payment of the royalties. Second, even without this contractual language, Iowa law establishes that HIG's use of the Meredith Marks is unauthorized. Iowa law provides that a material failure to perform operates as a matter of law as the non-satisfaction of a condition. Restatement (Second) Contracts § 237; Van Oort Constr. Co., Inc. v. Nuckoll's Concrete Serv., Inc., 599 N.W.2d 684, 692 (Iowa 1999) (quoting § 237). Third, dismissal for failure to state a claim can occur only where there is no factual issue to be resolved. Thus, such dismissal would be proper only where the Court concluded that the Limited License Agreement unambiguously provides that payment of the royalties is not a condition precedent to HIG's use of the Meredith Marks. The Agreement cannot be so construed because that construction conflicts with the Agreement's "subject to" language and because Iowa law imposes such a condition as a matter of law.

## A.    The Limited License Agreement Conditions HIG's Continued Right To Use The Meredith Marks Upon The Payment Of Royalies.

The predicate for the Order to Show Cause, as Meredith understands it, is Defendant HIG's argument that the Limited License Agreement does not condition HIG's right to use the Meredith Marks on the payment of royalties. Thus, even though HIG admittedly has not paid Meredith at least $1 million in royalties, its use of the Meredith Marks remains authorized until

10

Meredith terminates the Agreement. That position is contrary to the Agreement's express language and contrary to Iowa contract law, which governs the construction of the Agreement (Terms and Conditions § 11).

### 1.    Unambiguous Language Of The Agreement.

Iowa law is well established that "when a contract is not ambiguous, it will be enforced as written," and the parties' intention as expressed in the contract prevails. See Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents, 471 N.W.2d 859, 862-63 (Iowa 1991).[5] Section 1.1.1 (unaddressed by HIG or the Court in its ruling), entitled "Rights Granted," in establishing the conditional nature of the license grant to HIG, provides:

> Subject to the terms and conditions of this Agreement, Meredith grants Licensee the right, during the Term, to reproduce and use the Branding Elements. . . . .

Agreement § 1.1.1 (emphasis added).[6] The words "subject to" mean in a contract that a party's duty to perform is <u>conditioned</u> by the "subject to" clause.[7] Thus, the license grant to HIG and

---

[5] See also Ridinger v. Iowa, 341 N.W.2d 734, 737 (Iowa 1983) (refusing to consider extrinsic evidence of party's subjective interpretation of contract language when language was unambiguous); Mopper v. Circle Key Life Ins. Co., 172 N.W.2d 118, 124 (Iowa 1969) ("It is the duty of the courts to give effect to the language of the contract in accordance with its plain and ordinary meaning . . . . If the language of the contract is clear and unambiguous, the intention expressed therein controls.") (internal citations omitted).

[6] HIG misleadingly asserted below that the "Agreement is clear that the license granted to HIG for the use of the Branding Elements 'will commence on the date of the later signature on the License Summary and, unless otherwise terminated, will continue until the expiration of the last Contract Year . . . .'" HIG Opp. at 5 (citing Limited License Agreement ¶ 5.1) (emphasis omitted). This assertion is false and HIG's "quote" is misleading. Section 5.1 does not say "the license granted to HIG . . . will commence . . . and, unless otherwise terminated, will continue until the expiration of the last Contract Year' . . . '" Rather, it says the "<u>The Term of this Agreement will commence</u> . . . ." (emphasis added). Thus, contrary to what HIG argued, Section 5.1 does <u>not</u> address whether the payment of royalties is a condition precedent to the continued right of HIG to use the license.

[7] See, e.g., Riess v. Murchison, 329 F.2d 635, 643 (9th Cir. 1964) (meaning usually attributed "to words such as 'subject to' is that a promise so limited is conditional."); Shared Imaging, Inc. v. Campbell Clinic, Inc., 994 F. Supp. 919, 924 (W.D. Tenn. 1998) ("[W]hen used in connection with contracts, these words ['subject to'] usually indicate a condition on a party's duty of

11

Meredith's permission for HIG to continue to use the Meredith Marks is expressly and unambiguously conditioned upon HIG's compliance with the terms and conditions of the Agreement.[8]  HIG agreed that one such "material" term was the requirement to pay royalties, and that the failure to make a royalty payment is a "material breach."    Agreement (License Summary) § G.3.

Under standard well-established contract principles, such a condition "must occur" before Meredith's performance "under a contract becomes due."  Restatement (Second) Contracts § 224.  Thus, "[p]erformance of a duty subject to a condition cannot become due unless the condition occurs . . . ."  Id. § 225.  See Taylor Enterprise, Inc. v. Clarinda Prod. Credit, 447 N.W.2d 113, 117 (Iowa 1989) (citing Restatement (Second) Contracts § 225, and holding that failure to pay "discharges" the other party's obligation).  Accordingly, since HIG did not satisfy the "condition" by paying royalties, HIG no longer had the right to Meredith's performance, i.e, its permission to use the Meredith Marks.

Other provisions of the Agreement support this construction that the license grant to HIG is conditioned upon its payment of royalties.  As noted above, the Agreement defines nonpayment of royalties as a "material breach."  It further specifies that for such a material breach there is no "adequate remedy at law" and grants Meredith the "right" to injunctive relief:

> Licensee [HIG] agrees that Meredith will have no adequate remedy at law
> if Licensee breaches a material term of this Agreement.  As such, Licensee

---

performance"), aff'd, 173 F.3d 856 (6th Cir. 1999); 17A AM. JUR. 2D Contracts § 455 (2008 West) (the employment of words such as "'subject to' usually indicates that a promise is not to be performed except upon a condition").

[8]    In support of its proposition that Meredith must terminate the Limited License Agreement before it is entitled to an injunction, HIG principally relied below upon a single unpublished decision from the Western District of Texas.  See Spectrum Creations, L.P. v. Carolyn Kinder Int'l, LLC, 2008 WL 416264, at *76 (W.D. Tex. Feb. 13 2008).  However, even that case recognizes that whether the payment of royalties is a condition precedent to the right to use the marks at issue depends in the first instance on the contract language itself.

12

> agrees that, in addition to any other remedy available to Meredith,
> <u>Meredith will have the right</u> to have any such breach restrained by
> equitable relief.

Agreement (Terms and Conditions) § 11 (emphasis added). The Agreement <u>unambiguously</u> imposes <u>no additional</u> requirement that Meredith terminate the license as well. The Agreement's specific grant to Meredith of the right to equitable relief restraining HIG upon a showing of non-payment of royalties establishes that HIG's right to use the marks is conditioned on such payment.

## 2.    Iowa Contract Interpretation Principles.

In addition to the unambiguous language of the Agreement, standard principles of contract interpretation under Iowa law establish that the parties intended the above clauses to condition HIG's right to use the marks on HIG's payment of royalties and that termination is not required for Meredith to prevent such unauthorized use. First, it is a well-established principle of contract interpretation under Iowa law that the court should "give effect to every provision of a contract." <u>Buser v. Grande Ave. Land Co.</u>, 234 N.W. 241, 244 (Iowa 1931) (quoting <u>T.M. Sinclair & Co. v. Nat'l Sur. Co.</u>, 107 N.W. 184, 187 (Iowa 1906)); <u>see also</u> <u>Koenigs v. Mitchell Cty. Bd. of Supervisors</u>, 659 N.W.2d 589, 594 (Iowa 2003) (refusing to interpret contractual term apart from context of agreement as a whole); <u>Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.</u>, 266 N.W.2d 22, 26 (Iowa 1978) ("Courts must strive to give effect to all the language of a contract."). Indeed, as stated in Williston on Contracts:

> [E]very word, phrase or term of a contract must be given effect. An interpretation
> which gives effect to all provisions of the contract is preferred to one which
> renders a portion of the writing superfluous, useless or inexplicable.

11 Williston on Contracts § 32:5 (4th ed. 2007). Here, to give effect to the "subject to" language and Meredith's "right" to obtain equitable relief upon non-payment of royalties necessarily means that the license grant is conditioned upon the payment of royalties.

Second, Iowa has embraced the well-established principle of contract interpretation that the Court should not rewrite the contract to insert contractual language where none exists. As the Iowa Supreme Court has stated:

> It is not within the province, function, duty or power of the court to alter, revise, modify, extend, rewrite, or remake a contract by construction, or to make a new, or different, contract for the parties.

Smith v. Stowell, 125 N.W.2d 795, 799 (Iowa 1964) (quotation omitted). As the Court stated in Balins Properties., Inc. v. First National Bank of West Union, No. 05-0794, 2006 WL 2871975, at *3 (Iowa Ct. App. Oct. 11, 2006) upon refusing to add a term to parties' contract, "[i]t would be chaotic to allow courts to insert new terms into contracts theretofore bargained and negotiated at arms-length."[9]

Here, as noted above, the Limited License Agreement nowhere requires Meredith to terminate the contract before it can exercise its right to seek injunctive relief. To the contrary, it defines non-payment of royalties as a "material breach," for which there is no "adequate remedy at law" and grants Meredith, where there is such a material breach, the "right" to injunctive relief. Agreement (License Summary) § G.3; (Terms and Conditions) § 11. Moreover, Section 5.2, entitled "Termination," specifically provides that it is "[w]ithout prejudice to any other right or remedy available to Meredith . . . ." For the Court to require termination before Meredith can exercise its "right" to prevent the unauthorized use of its marks is simply "insert[ing] new terms into contracts theretofore bargained and negotiated at arms-length," and is specifically prohibited under Iowa law. Balins, 2006 WL 2871975, at *3.

---

[9] See also U.S. v. Bradford, 461 F. Supp. 2d 904, 917 (N.D. Iowa 2006) ("It is not the province of the court to rewrite a contract to provide terms"); 11 Williston on Contracts § 31:5 (4th ed. 2007) (court cannot rewrite contract).

14

Third, Iowa courts follow the general principle of contract construction that "while words are to be given their ordinary meaning, particular words and phrases in a contract are not to be interpreted in isolation." See Iowa Fuel, 471 N.W.2d at 863 (citing Connor v. Thompson Constr. & Dev. Co., 166 N.W.2d 109, 112 (Iowa 1969)). Here, this principle requires that Sections G.3, 1.1.1, 5.2, and 11 of the Agreement be read together. Those provisions state that Meredith's obligations are "subject to" the terms of the Agreement (Section 1.1.1), including the requirement that HIG pay royalties for its use of the Meredith Marks; that HIG's non-payment of such royalties constitutes a "material breach" of the Agreement (Section G.3), for which the parties have agreed "there is no adequate remedy of law" (Section 11); and that Meredith's right to terminate the Agreement does not affect "any other right or remedy of Meredith" (Section 5.2). Read together, those provisions make clear that the parties expressly agreed to permit Meredith to preclude use of its marks if HIG had not paid its royalties, regardless of whether it first terminated the Agreement.

Fourth, Iowa adheres to the doctrine that the Court should adopt a "reasonable and fair" interpretation. See, e.g., Kaydon Acquisition Corp. v. Custum Mfg., Inc., 301 F. Supp. 2d 945, 967 (N.D. Iowa 2004) (noting that "under Iowa law, '[c]onstruction [of a contract's terms] should be . . . reasonable and fair and not absurd'") (quoting Winfield State Bank v. Snell, 226 N.W. 774, 777 (Iowa 1929)); see also Fashion Fabrics, 266 N.W.2d at 26 ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all of the contract's terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."). Here, HIG has not offered and there is no rational reason why Meredith would agree that HIG could refuse to pay royalties – including the $1 million in royalties now in default – yet continue to use the Meredith Marks. Such a result is neither reasonable nor fair.

15

**B.      Hornbook Contract Law Adopted In Iowa Establishes That HIG's
          Right To Continue To Use The Meredith Marks Is Conditioned On Its
          Payment Of Royalties.**

Even if the Limited License Agreement had been silent on these issues, HIG's

proposition that it can continue to use the Meredith Marks without paying royalties would fail. It

is hornbook contract law adopted in Iowa that a material failure to perform operates as a matter

of law as the non-satisfaction of a condition, excusing Meredith's future performance of allowing

HIG to use its trademarks:

> [I]t is a condition of each party's remaining duties to render performance to be
> exchanged under an exchange of promises that there be no uncured material
> failure by the other party to render any such performance due at an earlier time.

Restatement (Second) Contracts § 237 (emphasis added). See also id. cmt. b (1981) ("[W]here

performances are to be exchanged under an exchange of promises, each party is entitled to the

assurance that he will not be called upon to perform his remaining duties of performance with

respect to the expected exchange if there has already been an uncured material failure of

performance by the other party.").

Courts in Iowa, whose law governs the interpretation of this contract (Agreement § 11),

have adopted the Restatement of Contracts and this principle,[10] as have courts throughout the

---

[10]  See Van Oort, 599 N.W.2d at 692 (quoting § 237); Arthur L. Christoffersen Irrevocable Trust
v. Yellow Book USA, Inc., No. 06-CV799-LRR, 2007 WL 2610955, at *7 (N.D. Iowa Sept. 6,
2007) (observing that Iowa Supreme Court quoted § 237 as the prevailing rule in Iowa in Van
Oort); Fashion Fabrics, 266 N.W.2d at 29 (citing Restatement (Second) Contracts § 262, now
§237, in support of finding that a party's "material and substantial" breach of sublease
established the non-breaching party's defense in breaching party's action against it); Kelly v.
Iowa Mutual Ins. Co., 620 N.W.2d 637, 641 (Iowa 2000) ("It is a basic principle of contract law
that once one party to a contract breaches the agreement, the other party is no longer obligated to
continue performing his or her own contractual obligations.") (internal citation omitted).

16

United States.[11] Moreover, Iowa courts apply a presumption that applicable law is incorporated into the parties' contracts as if expressly provided therein:

> [E]xisting statutes and the settled law of the land are a part of every contract, and must be read into it as though it were specifically referred to therein.

Cornick v. Southwest Iowa Broad. Co., 107 N.W.2d 920, 921 (Iowa 1961) (emphasis added). See also Miller v. Marshall County., 641 N.W.2d 742, 751 (Iowa 2002) ("There is a presumption that parties incorporate applicable statutes into their contracts."). Thus Restatement (Second) Contracts § 237 must be presumed to be incorporated into the Agreement here.

As noted above, under standard well-established Iowa contract principles, such a condition "must occur" before Meredith's performance "under a contract becomes due." Restatement (Second) Contracts §§ 224, 225. See Taylor Enterprise, 447 N.W.2d at 117 (citing Restatement (Second) Contracts § 225, and holding that failure to pay "discharges" the other party's obligation). Accordingly, since the condition of the payment of royalties did not occur, HIG had no right to continue to use the Meredith Marks.[12]

---

[11] See, e.g., Conley v. Pitney Bowes, 34 F.3d 714, 717 (8th Cir. 1994) (applying § 237 and finding constructive condition precedent that was not met precluded duty of other party to perform); Long Island Savings Bank, FSB v. U.S., 503 F.3d 1234, 1251-52 (Fed. Cir. 2007) (applying § 237 and finding plaintiff's uncured material failure to perform contract precluded plaintiff's claim for damages); Bernard v. Las Americas Commc'ns, Inc., 84 F.3d 103, 108 (2d Cir. 1996) (citing § 237 and finding attorney's obligation to provide legal representation to defendant to be condition precedent of defendant's payment obligations); In re Lucre, Inc., 339 B.R. 648, 652 (Bankr. W.D. Mich. 2006) ("The right of one party to cease performing under an agreement if the other party is in material breach is fundamental to any contract where both parties have ongoing performance obligations," and quoting § 237); Beckerman v. M. Hidary & Co., Inc., 324 B.R. 434, 443-44 (D. Conn. 2005) (citing § 237 and finding that company was relieved of obligation when other party materially breached licensing agreement); RE/MAX of Texas, Inc. v. Katar Corp., 989 S.W.2d 363, 364-65 (Tex. 1999) (same).

[12] HIG argued below that, instead of following the well-established principle of contract construction in Section 237 and the Iowa cases adopting and applying that provision, this Court should instead follow only an obscure statement in § 7:24 of NIMMER ON MODERN LICENSING LAW. That statement suggests that, in many cases, there is a presumption that royalties are not a precondition to the right to exercise licensing rights. See HIG Opp. at 12 (quoting Spectrum,

In recognition of this principle as applied in the trademark context, numerous courts have

consistently held that a licensee cannot have it both ways by refusing to pay and then continuing

to use the licensed mark. For example, in Donoghue v. IBC/USA Pubs., Inc., 886 F. Supp. 947

(D. Mass), aff'd, 70 F.3d 206 (1st Cir. 1995), the defendants-licensees stopped making the

royalty payments that had entitled them to use the plaintiff-licensor's name in the title of various

publications. Although he had not terminated the agreement, the plaintiff sought an injunction to

prevent continued use of the relevant marks. The Donoghue defendants argued that the plaintiff

violated the agreement between them, and that thus the plaintiff was not entitled to injunctive

relief. In rejecting this contention, the Court held:

> While the plaintiff may have failed to comply with all of the terms of the
> [agreement], the defendants were not free to stop paying royalties. In a case
> similar in some respects to this one, the Third Circuit rejected the defendant's
> position that it could stop paying royalties and continue to use the plaintiff's
> name, because he thought that the plaintiff had violated the applicable
> contract. . . . The court stated: "Under basic contract principles, when one party
> to a contract feels that the other contracting party has breached its agreement, the
> non-breaching party may either stop performance and assume the contract is
> avoided, or continue its performance and sue for damages.    Under no
> circumstances may the non-breaching party stop performance and continue to take
> advantage of the contract's benefits . . . . [U]se of the trademark under these
> circumstances amounts to infringement under the Lanham Act."

Donoghue, 886 F. Supp. at 954 (quoting S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 376

(3d Cir. 1992) (emphasis added). Thus, the Court granted a preliminary injunction under the

---

2008 WL 416264, at *76 (quoting NIMMER ON MODERN LICENSING LAW § 7:24)). Notably, however, no Iowa cases are cited in support of this proposition (in Spectrum, Nimmer, or elsewhere), and it is not the law in Iowa. In any event, Nimmer's proposition can be harmonized with Section 237 because to the extent that a breach is not material, the payment of royalties would not constitute a precondition to the exercise of licensing rights. Here, however, the parties expressly agreed that such a breach is material. See Agreement (License Summary) § G.3 ("the parties understand that the failure to make the payments described above shall constitute a material breach of this Agreement.").

Lanham Act against the continued use of the licensed name, even thought the plaintiff had not terminated the license agreement. Id.

Similarly, in Ryan v. Volpone Stamp Co., Inc., 107 F. Supp. 2d 369 (S.D.N.Y. 2000), as here, the licensee argued that the licensor, former baseball player Nolan Ryan, had violated the exclusivity provisions of the license agreement. On this basis, the licensee refused to pay royalties and argued that it should be free to continue to sell the merchandise bearing the licensed intellectual property. The court rejected this argument, explaining:

> Defendant argues that Ryan breached the agreements, specifically by licensing his name to others in violation of the exclusivity provision . . . thereby justifying [Defendant's] refusal to continue to pay royalties. ... [A] party to a contract may respond to the other party's breach in one of two ways: the non-breaching party may stop performance and sue for total breach, or continue to perform and sue for partial breach. What the non-breaching party cannot do is avoid its obligations under the contract and yet continue to reap the benefits.

Id. at 397-398 (citations omitted) (emphasis added).

In Romacorp, Inc. v. TR Acquisition Corp., No. 93 Civ. 5394 (MEL), 1993 WL 497969 (S.D.N.Y. Dec. 1, 1993), despite notice and the opportunity to cure, a licensee continued to operate under the licensed mark but refused to pay royalties. The licensee's action was based on the licensor's alleged failure to honor a geographic exclusivity provision of their agreement. The court entered an injunction against further use of the plaintiff's trademarks, stating:

> The law is clear that even if [the licensee] established breaches by [the licensor], ... those breaches would not relieve [the licensee] of its obligation to pay franchise fees . . . .

> [It] is against the law as well as sound morals to permit a party to a contract to repudiate the contract or his obligation under it, and the same time retain the consideration that he has received . . . . Defendant's counterclaims will, of course, be adjudicated in their own right; however, the alleged wrongs of plaintiff do not constitute affirmative defenses to defendant's non-payment of franchise fees.

Id. at *12 (citing McDonald's Corp. v. Robert A. Makin, Inc., 653 F. Supp. 401, 403 (W.D.N.Y. 1986); S & R Corp., 968 F.2d at 375; Costandi v. Aamco Automatic Transmissions, Inc., 456

19

F.2d 941, 942-43 (9th Cir. 1972); Burger King Corp. v. Majeed, 805 F. Supp. 994, 1003 (S.D.
Fla. 1992); Little Caesar Enters., Inc. v. R-J-L Foods, Inc., 796 F. Supp. 1026, 1034 (E.D. Mich.
1992); Cle-Ware Rayco, Inc. v. Perlstein, 401 F. Supp. 1231, 1234 (S.D.N.Y. 1975); Burger
King Corp. v. Hall, 770 F. Supp. 633, 639 (S.D. Fla. 1991)). Accord Jet Blast, Inc. v. Hershey's
Mill Indus. Servs., Inc., 32 U.S.P.Q.2d 1173, 1994 WL 220000, at *8 (E.D. Pa. 1994) (when
defendant "failed to make payments" required by agreement, "defendant forfeited its right to use
the trade name").

    This principle that a material failure to perform operates as a matter of law as the non-
satisfaction of a condition does not (and logically could not) depend on whether the licensor has
terminated the agreement. Indeed, HIG's claim that, in all these cases granting injunctive relief
based on the failure to pay royalties, the licensor had terminated the licensee or the license had
terminated, is simply false. HIG Opp. at 13. See, e.g., Donoghue, 886 F. Supp. at 954; Dunkin
Donuts, Inc. v. Kashi Enters., Inc., 106 F. Supp. 2d 1325 (N.D. Ga. 2000); Dunkin Donuts, Inc.
v. Albireh Donuts, Inc., 96 F. Supp. 2d 146 (N.D.N.Y. 2000).[13]

    Significantly, even in those cases HIG cites, where the license was terminated, it only
shows that termination is sufficient, but not that it is necessary, to obtain injunctive relief.[14]

---

[13] Defendant argues that the cases cited by Meredith "do not dispute that proper termination of a
valid license agreement is required before a finding of infringement." Opp. at 13. This is faulty
logic. Clearly, the failure to dispute a supposed proposition that is not before the court, and
contrary to basic contract law, is a far cry from adopting that principle.

[14] The cases HIG cited below are also factually distinguishable from the circumstances
presented herein. For example, in Luxottica Group S.p.A. v. Bausch & Lomb, Inc., 160 F. Supp.
2d 545 (S.D.N.Y. 2001), the issue was whether the licensor had given the licensee adequate
notice and opportunity to cure before it terminated the license and sought relief. Id. at 550-551.
Nowhere, however, does the court hold that termination is always a prerequisite to seeking
injunctive relief. In Papa John's Int'l, Inc. v. Dynamic Pizza, Inc., 317 F. Supp. 2d 740 (W.D.
Ky. 2004) as well, nowhere does the court hold that termination is always a prerequisite to
seeking injunctive relief. In that case, the plaintiff was alleging termination, which, in
turn, under the agreement in issue, required notice. In the context of a motion for summary

Restatement (Second) Contracts § 237 does not require, as an additional element before the duty to perform is conditioned, that the contract be terminated. Rather, it only requires a "material failure to perform." Id.

In essence, HIG argued below, and the District Court found, that Meredith only had two choices: (1) terminate the Agreement (though Meredith has at all times stood willing and able to perform) and then seek injunctive relief; or (2) continue to honor its obligations under the Agreement, but stand powerless to prevent HIG from using the Marks for as long as it wishes, while withholding payment for such use. Setting aside the fact that such an unreasonable and unfair result is contrary to the express language of the Agreement, the Donoghue court presented the proper choice for HIG: HIG may continue to use the Meredith Marks, but be required to pay for that right, or, if it stops paying royalties, it must also cease using the Meredith Marks. Most importantly, "[u]nder no circumstances may the [licensee] stop performance and continue to take advantage of the contract's benefits." Id. at 954 (citing S & R Corp., 968 F. 2d at 376) (emphasis added).[15]

Moreover, the Agreement is clear that while termination is one option available to Meredith, it is not the only option under these circumstances. Indeed, Section 5.2 of the

---

judgment, the court merely stated that there was no evidence that notice of termination was given, as required by the agreement, and it therefore could not find that the termination was effected. Similarly, in Oleg Cassini, Inc. v. Couture Coordinates, Inc., 297 F. Supp. 821 (S.D.N.Y. 1969), the licensor was denied relief because it did not object to the lack of payment for over four months, thereby waiving its right to prompt payment. Moreover, when the licensor did give notice, it did not provide an opportunity for cure and when the licensee attempted to pay what was due, albeit with a check with a restrictive endorsement, the licensor was unwilling to give the licensee an opportunity to tender an unrestricted payment. In contrast, Meredith properly provided HIG with adequate notice and an opportunity to cure, and it is also ready and willing to accept payment of the monies it is owed.

[15] HIG argued that Donoghue should be ignored because, in S & R Corp., a case that Donoghue cites, the plaintiff had terminated the agreement. To the contrary, while the facts were different in S & R Corp., the fact that Donoghue reached the same conclusion by applying the correct

Agreement, which sets forth the proper methods of terminating the Agreement, expressly states that termination is "[w]ithout prejudice to any other right of remedy available to Meredith." Agreement § 5.2. Thus, the parties specifically agreed that, while termination is an option available to either party under certain circumstances (and available to Meredith here), Meredith is not required to terminate before seeking relief for HIG's breach of the Agreement. Accordingly, Section 5.2 of the Agreement expressly permits Meredith to continue performing its obligations under the Agreement while seeking an injunction from HIG's continued unauthorized use of the Meredith Marks.[16]

Finally, despite the clear contract language to the contrary, HIG argued that its continued use of the Meredith Marks is authorized because Meredith has continued to perform its obligations under the Agreement, such as continuing to provide a link to HIG's website on bhg.com. This argument is legally meritless under Iowa law. As established above, in addition to the contractual language specifying Meredith has the right to injunctive relief upon a "material breach," Restatement (Second) Contracts § 237 provides that HIG has no right to continue to use the marks if it has an "uncured material failure" to perform. Neither the Agreement nor this hornbook law adopted in Iowa requires Meredith to breach the Agreement to obtain relief.[17]

---

principle reinforces that it is irrelevant whether Meredith terminated the Agreement with HIG.

[16] In addition, HIG's argument that Meredith must first terminate before seeking an injunction under the Lanham Act is simply a legal shell game to avoid additional damages it might have to pay if it terminates (as opposed to Meredith). For example, the Agreement's termination provisions provide that, if Meredith terminates the Agreement, it will be owed a different amount of guaranteed minimum royalties than if HIG terminates. See generally Agreement § 5.2 et seq.

[17] If Meredith had not continued to perform its obligations under the Agreement, then HIG would have argued that Meredith was in material breach of the Licensing Agreement and, on that basis, HIG was justified in refusing to pay the royalties that are due.

**C.    At A Minimum, The Agreement's Language, Iowa Contractual Interpretation Principles, And Iowa Hornbook Law That Conditions HIG's Right To Continued Use Of The Marks On Its Payment Of Royalties Creates Factual Issues Rendering Dismissal Improper.**

As this Court has recently held, in determining whether to dismiss a complaint for failure to state a claim, the Court "must construe the allegations and facts in the complaint in the light most favorable to the plaintiff and must grant the plaintiff the benefit of all inferences that can be derived from the facts alleged in the complaint." Vila, 536 F. Supp. 2d at 45-46 (Walton, J.). This Court obviously cannot dismiss the Lanham Act and unfair competition claims if it finds that there are disputed issues of material fact.[18]

In the context of the instant Order to Show Cause, these principles establish that the Court cannot dismiss those claims unless it finds, after applying the above presumptions, giving Meredith "the benefit of all inferences," that: (a) the Agreement unambiguously provides that HIG's permission to use the Meredith Marks is not conditioned on its payment of royalties; and (b) the Agreement unambiguously requires termination to render HIG's use of the marks unauthorized, even though HIG has admittedly failed to pay over $1 million in royalties.

Under the facts and law here, this Court simply cannot make these required findings. Meredith believes, as demonstrated above, that the Agreement's language, standard well-accepted principles of Iowa contract law, and hornbook law adopted in Iowa all unambiguously establish the opposite: that HIG's right to continue to use the Meredith Marks is conditioned on its payment of royalties and that Meredith is not required to terminate HIG to render HIG's use unauthorized. However, in any event, even if the Court concludes that the Agreement's

---

[18]    A motion to dismiss for failure to state a claim under Rule 12(b)(6), Fed. R. Civ. P., is governed by the same standard as motion for judgment under the pleadings under Rule 12(c), Fed. R. Civ. P. Thus, where disputed issues of material fact exist, a motion to dismiss for failure to state a claim must be denied. See Roof v. Howard Univ., 501 F. Supp. 2d 108, 113 (D.D.C. 2007) (citing Egilman v. Keller & Heckman, LLP, 401 F. Supp. 2d 105, 109 (D.D.C. 2005).

language and Iowa law do not <u>unambiguously</u> establish the above, at a minimum they establish that disputed factual issues remain on these points, precluding dismissal for failure to state a claim.

## D.   It Is Undisputed That Meredith Meets The Remaining Requirements For Establishing Its Trademark And Unfair Competition Claims.

HIG has <u>not</u> disputed that Meredith meets the remaining requirements for establishing its trademark and unfair competition claims. Those elements are briefly described below.

### 1.   The Meredith Marks Are Valid, Distinctive Marks.

Meredith easily satisfies the second criterion entitling it to protection, i.e., that the Meredith Marks are either (1) "inherently distinctive" or (2) have "acquired distinctiveness through secondary meaning." <u>Partido</u>, 312 F. Supp. 2d at 12. Indeed, <u>HIG did not dispute (as it could not) that the Meredith Marks are valid, distinctive marks</u>.

Trademarks that are registered on the Principal Register are presumptively inherently distinctive or distinctive through secondary meaning and are, therefore, protectable.[19] All of the registrations for the Meredith Marks are on the Principal Register.    Johnson Decl. ¶ 9. Therefore, those marks are presumed to be sufficiently distinctive to be protected, either because they are inherently distinctive or because they have acquired secondary meaning.[20]   Moreover,

---

[19]   Lanham Act § 7(b), 15 U.S.C. § 1057(b); <u>John Curry Skating Co., Inc. v. John Curry Skating Co.</u>, 626 F. Supp. 611, 616 n.2 (D.D.C. 1985) (the fact that a mark is registered on the Principal Register "is *prima facie* evidence of secondary meaning").    <u>Accord Am. Ass'n for the Advancement of Science</u>, 498 F. Supp. at 256 ("A mark's registration on the Principal Register is prima facie evidence of . . . its having acquired secondary meaning").

[20]   <u>Malarkey-Taylor Assocs., Inc. v. Cellular Telecomms. Indus. Ass'n</u>, 929 F. Supp. 473, 476 (D.D.C. 1996) (registration is prima facie evidence "'that the 'mark is distinctive'") (quoting <u>Am. Ass'n for the Advancement of Science</u>, 498 F. Supp. at 254). A number of registrations for the Meredith Marks are incontestable since they have been in place for over five years and cannot be challenged on the basis that the marks are merely descriptive. Lanham Act § 15(a), 15 U.S.C. § 1115(a); <u>Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.</u>, 469 U.S. 189, 205 (1985) ("holder of a registered mark may rely on incontestability" to enjoin infringement and "such action may not be defended on the grounds that the mark is merely descriptive.").

24

the Patent and Trademark Office issued the various registrations for the Meredith Marks without requiring Meredith to establish secondary meaning. Accordingly, a presumption exists that the Meredith Marks are inherently distinctive.[21]

Furthermore, HIG conceded that "the reputation of and goodwill associated with the Branding Elements," defined in Exhibit A to the Agreement as the BETTER HOMES AND GARDENS® mark and the Plaid Checker Board design mark (i.e., the Meredith Marks), "are among Meredith's most valued assets." Agreement (Terms and Conditions) § 1.5.3. Indeed, HIG agreed to pay Meredith millions of dollars for permission to use the Meredith Marks. For these reasons, it is indisputable that the Meredith Marks are entitled to protection.

## 2.    Likelihood Of Confusion.

Meredith also easily meets the final requirement entitling it to trademark protection, i.e., a showing that there is a substantial likelihood of confusion between the plaintiff's mark and the infringer's mark.[22] Trademark infringement actions typically involve claims where the similarity

---

[21]   See, e.g., Synergistic Int'l, LLC v. Korman, 470 F.3d 162, 172 (4th Cir. 2006) (plaintiff "entitled by law to the rebuttable presumption that its . . . mark is suggestive" because PTO registered mark without proof of secondary meaning); Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 117 (1st Cir. 2006) (same); Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 345 (2d Cir. 1999) (same). The long and widespread use of the Meredith Marks, combined with the significant promotional and advertising efforts relating to those marks, would easily establish that the marks have acquired secondary meaning, even without the presumption set forth above. The BETTER HOMES AND GARDENS® mark has been in use since 1922. Johnson Decl. ¶ 5. Plaintiff's BETTER HOMES AND GARDENS® magazine reaches over 39 million households each month. Meredith has expanded the use of the mark to a wide variety of media platforms, providing information and inspiration in the home and family areas, as well as to numerous consumer products. Id. ¶ 6. The "Plaid Checker Board" design mark has been in use since 1968 and it, too, has been used on products with extensive sales. Id. ¶ 8. See Duggal v. Krishna, 554 F. Supp. 1043, 1047 (D.D.C. 1983) (finding secondary meaning in COURTIER DIPLOMATIQUE mark for magazine based on publication of magazine for six months, $100,000 in expenditures, and demand letters from creditors); Russian Acad., 1998 WL 34333239 at *3 (secondary meaning established in GEOMAGNETISM AND AERONOMY mark, based, inter alia, on use of the mark as a journal title for forty years).

[22]   See Russian Acad., 1998 WL 34333236 at *3 (Section 43(a) claim); Blacks in Gov't v. Nat. Ass'n of Blacks Within Gov't, 601 F. Supp. 225, 227 (D.D.C. 1983) ("The key issue that the

of the marks is at issue. In such cases, the court generally analyze a variety of factors to determine if there is a likelihood of confusion between the plaintiff's and the defendant's mark.[23]

In the instant matter, however, there is no dispute that HIG continues to promote numerous products using exactly the same marks as Meredith, i.e., the Meredith Marks. Johnson Decl. ¶ 39. "Where the marks, as here, are identical, the likelihood of continued confusion is clear . . . ." Crime Control, Inc. v. Crime Control, Inc., 624 F. Supp. 579, 581 (D.D.C. 1984) (emphasis added). See United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134, 142 (3d Cir. 1981) ("there is a great likelihood of confusion when an infringer uses the exact trademark").

### E.   If This Court Is Inclined To Dismiss Counts II Through IV, It Should Instead Hold Its Ruling In Abeyance Until The D.C. Circuit Has Ruled On The Appeal Of The Denial Of The Preliminary Injunction.

Meredith has appealed this Court's denial of the preliminary injunction, and is seeking expedited resolution of that appeal. As this Court explained in its Order to Show Cause, the basis for that Order is in part the same as its decision on the motion for a preliminary injunction: the Court's conclusion that HIG's use of the marks is not unauthorized because Meredith has not terminated the Limited License Agreement.

If this Court is inclined to dismiss Meredith's trademark and unfair competition claims, Meredith respectfully requests that this Court hold in abeyance its determination on the Order to Show Cause until the Court of Appeals has ruled on that appeal. Holding the decision in abeyance will provide for the more efficient conduct of this case, because if Meredith prevails on

Court must examine . . . on both the statutory and common law claims is whether the adoption of the trade name . . . has resulted in a 'likelihood of confusion'") (citation omitted).

[23] These factors include: (1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) evidence of actual confusion; (5) the defendant's purpose or reciprocal of good faith in adopting its own mark; (6) the quality of defendant's product; and (7) the sophistication of the relevant consumer market. See, e.g., Partido, 312 F. Supp. 2d at 14. As HIG is using exactly the same marks as the Meredith Marks, these factors all support a likelihood of confusion determination.

its appeal (or on its position with respect to the imposition of a condition precedent), the prior

dismissal of the trademark and unfair competition claims will complicate the remainder of the

case and pose the risk of a needless waste of the Court' and the parties' resources. For example,

if Counts II through IV are dismissed, and then reinstated, the parties will likely have to repeat

various aspects of the discovery process, including re-deposing various witnesses.

## CONCLUSION

For the reasons set forth above, Meredith respectfully requests that this Court dismiss the

Order to Show Cause, and allow Counts II, III, and IV to remain in the Complaint.

Respectfully submitted,

Of Counsel

James G. Sawtelle

by MDH

Faegre & Benson, LLP
1900 Fifteenth Street
Boulder, CO 80302-5414
Telephone: (303) 447-778
Facsimile: (303) 447-7800
jsawtelle@faegre.com

Michael D. Hays (Bar No. 32418)
Mitchell H. Stabbe (Bar No. 333427)

Dow Lohnes PLLC
1200 New Hampshire Ave., N.W.
Washington, D.C. 20036-6802
Telephone: (202) 776-2000
Facsimile: (202) 776-2222
mhays@dowlohnes.com
mstabbe@dowlohnes.com

Counsel for Appellant Meredith Corporation

April 28, 2008

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "Memorandum Of Points And Authorities In

Response To Order To Show Cause" were served on the following persons, at their said address,

by electronic mail and by first class mail, this 28th day of April, 2008:

> Martin Lobel, Esq. (lobel@lnllaw.com)
> Lee Ellen Helfrich, Esq. (helfrich@lnllaw.com)
> Lobel, Novins & Lamont, LLP
> 888 17th Street, N.W.
> Suite 810
> Washington, DC  20006
>
> Scott M. Dewolf, Esq. (sdewolf@rhmlawyers.com)
> Kathleen M. Patrick, Esq. (kpatrick@rhmlawyers.com)
> Rochelle, Hutcheson & McCullough, LLP
> 325 N. St. Paul Street
> Suite 4500
> Dallas, Texas  75201

Michael D. Hays